521 A.2d 1235

**Charles A. BEESLEY, et al**

v.

**Burton D. HANISH, et al**

**No. 761, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

March 6, 1987.

484

John H. Murray (Robert M. Cattaneo, Gwynn X. Kinsey and Miles & Stockbridge, on the brief), Easton, for appellants.

Willard C. Parker, II (George E.H. Gay and Miller, Wheeler, Thompson & Thompson, on the brief), Easton, for appellees.

Argued before GARRITY, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

Originally owned and developed by Martingham Inn, Inc. (M.I.I.), Martingham is a pleasant, semi-rural subdivision located just outside St. Michaels in Talbot County, Mary-

land. Section No. Three of Martingham encompasses, among others, 15 inland lots, namely, lots 25 through 31 and lots 33 through 40. These lots surround four acres called the pond parcel although there is no pond presently located there. This case is about a suit in the Circuit Court for Talbot County by the owners of lots 25 and 39, the Hanishes and the Kroegers, respectively, appellees, for declaratory and injunctive relief against the remaining lot owners, including the two appellants, Beesley and Driscoll, because in September, 1985 Beesley and Driscoll commenced construction of a pond on the pond parcel.

M.I.I. purchased the tract of land now developed as Martingham in 1969. A plat of Section No. Three of Martingham, recorded July, 1971, indicated a pond on the four-acre parcel.[1] M.I.I.'s first conveyance of the inland lots in Section No. Three was lot 25 in 1971. The last five of these lots were not sold until January, 1976. The 15 deeds conveying the lots bordering on the pond parcel were by no means consistent in reference to the pond parcel. In the deed to lot 25, known as the Welton deed, M.I.I. conveyed a one-fifteenth undivided interest in the pond parcel, covenanted to build a pond, covenanted to transfer the remaining one-fifteenth interests to other lot owners, and imposed restrictions on the management and use of the pond. The Hanishes, appellees, are successors to the Welton deed. Beesley and Driscoll, appellants, jointly own several lots. The deed to one of those lots, lot 36, includes a transfer of a one-fifteenth undivided interest in the pond parcel and a reference to the covenants and restrictions listed in the Welton deed. Other deeds transferred to the inland lot owners either contain similar provisions to those in the deed to lot 36, provide no mention of the pond parcel or, like appellees Kroegers' deed to lot 39, reference the

---

1. *See* plat attached as Appendix. The pond parcel appears in the center of the plat surrounded by lots 25 through 31 and 33 through 40.

covenants and restrictions in the Welton deed without a conveyance of an interest in the pond parcel.[2]

In a deposition entered into evidence at trial, Sidney Peters, the president and sole director of M.I.I. in the early 1970s, testified that in an effort to sell Martingham's inland lots, M.I.I. did some preliminary excavation of the pond parcel. M.I.I. hoped to show prospective buyers that a pond would in fact be built, but M.I.I. delayed completion of the pond until a majority of the lots could be sold. Only six of the 15 lots were sold by May 1, 1975, the date M.I.I. promised in the Welton deed to complete construction of the pond. Soon thereafter, M.I.I. encountered financial difficulties in completing Martingham's development and forfeited its charter in 1976 without completing the pond's construction. Except for some additional excavating undertaken by a non-party during 1982 in an attempt to test the pond parcel for use as a sewage lagoon, no further organized activity occurred on the parcel until the current controversy.

2. To summarize the deeds held by the various parties to this suit, we have grouped them according to the type of reference each made to the pond parcel.

The deeds to lot 26 owned by the Wilsons, lot 30 owned by Deyermond, and lot 28 owned by the Waites contain no reference to the pond parcel. In the deed to lot 27 owned by McKillips, M.I.I. expressly reserved to itself all rights and access to the pond parcel.

Five other lot owners hold title to lots which contain in the chain of title a devise of a one-fifteenth interest in the pond parcel, with a reference in their deeds to the covenants and restrictions in the Welton deed. Included in this category are Vinci who owns lot 29; Beesley and Driscoll who own lot 36; Doyle who owns lot 38; and the Welches who own lot 40, and whose own deed is silent but whose predecessor deed contained the one-fifteenth conveyance and the reference to the Welton deed covenants and restrictions.

The Lassondes, owners of lot 31, have no conveyance from M.I.I. concerning the pond parcel in their chain of title. Their own deed, however, grants them a one-fifteenth interest in the pond parcel and references the covenants and restrictions listed in the Welton deed.

The deeds to the final five lots made no conveyance of any interest in the pond parcel but did reference M.I.I.'s covenants and restrictions contained in the Welton deed. These lots include lot 34, owned by the Krauses; lots 33, 35 and 37, owned by Beesley and Driscoll; and lot 39, owned by the Kroegers.

The pond parcel contains an excavation of approximately three-and-one-half acres that ranges in depth from four to eight feet. Beesley and Driscoll presented extensive evidence that the pond parcel is dangerous and unsightly in its partially excavated state. In contrast, Hanish and Kroeger each expressed his pleasure in the unrefined character of the pond parcel and the habitat it provides for wildlife.[3] The only known active use of the pond parcel was by a local teenager who rode his three-wheeled motorized vehicle in the excavation.

Single family residences have been built on only six of the 15 lots that surround the pond parcel. Three of the homes are off the northern end of the pond parcel and are visually screened from other more intensely developed areas of Martingham by loblolly pine trees located on the pond parcel. Two of these houses, on lots 39 and 25, are owned by the Kroegers and the Hanishes, respectively. Beesley and Driscoll presented expert testimony, unrefuted at trial, that although the unimproved lots are otherwise in an attractive portion of Martingham, they have been difficult to resell and the condition of the pond parcel has had a negative influence on the appreciation of all the lots that surround it.

During the early months of 1985, Beesley and Driscoll purchased four of the lots that adjoin the pond parcel and one lot which adjoins an access strip to the parcel. They believed that with the consent of a simple majority of the owners of the lots surrounding the pond parcel they could complete the construction of the pond on the pond parcel. They sent letters to the owners of the other lots explaining their proposal to pay for and conduct the construction in compliance with M.I.I.'s original plan and requested each

---

3. The excavation is dominated by grasses and wetland reeds, most notably fragmites. Beesley and Driscoll presented unrefuted expert testimony that fragmites can be expected to spread throughout the excavation. This plant is considered a nuisance by wildlife authorities because of its invasive nature and its inability to provide habitat to wildlife.

owner to return a ballot indicating his or her approval or disapproval. Most of the other lot owners consented to Beesley's and Driscoll's plan. Beesley and Driscoll also obtained the approval of Sidney Peters, as trustee of M.I.I., to complete the pond in M.I.I.'s place.[4]

In September of 1985, Beesley and Driscoll began removing the scrub vegetation on the pond parcel. About eight days later, the Kroegers and the Hanishes obtained an *ex parte* injunction stopping the work. Later, an interlocutory injunction issued. Following a hearing, the trial judge permanently enjoined further construction on the pond parcel because Beesley and Driscoll had failed to obtain the unanimous consent of the owners of the lots adjacent to the pond parcel. The court then required Beesley and Driscoll to clear the debris created by their pre-injunction activities.

Beesley's and Driscoll's first appeal from this order was dismissed by this Court.[5] They have appealed again claim-

---

4. Due to the uncertainty regarding title to the pond parcel as the result of M.I.I.'s failure expressly to convey all of the undivided one-fifteenth interests in it, Beesley and Driscoll obtained M.I.I.'s written consent to complete the pond to the extent that M.I.I. retained any ownership interests in the pond parcel.

5. The clerk in the circuit court made a docket entry of the trial judge's October 30, 1985 order granting a permanent injunction on that same day. An appeal was noted November 29. The court filed a written order on December 4, 1985 spelling out its bench ruling but without a final judgment as to all claims. Although the Hanishes and the Kroegers had sought declaratory relief on the issue, the court did not declare who the owners of the property were. This Court dismissed the appeal in February, 1986 as premature because no written order had been entered when the appeal was noted. In response, the circuit court entered an order February 21 correcting the December order by making it *nunc pro tunc* to October 30, 1985. This would have corrected Beesley's and Driscoll's problem. At that point they could have appealed pursuant to Md.Cts. & Jud.Proc.Code Ann. § 12–303(3)(i) (1974, 1984 Repl. Vol., 1986 Cum.Supp.), which provides that a party may appeal from an interlocutory order granting an injunction if that party has already filed an answer. Beesley and Driscoll had already filed an answer. Apparently realizing, however, that the December order, which was merely backdated by the February order, was not in compliance with Rule 2–602, in March of 1986 yet another order was entered. Rule 2–602 provides that a judgment not dispos-

ing that they are entitled to complete construction of the pond because of their status as tenants in common of the pond parcel. They further contend that they do not need the unanimous consent of their co-tenants because their proposed construction of the pond will not prejudice either the co-tenants' common law rights to prevent waste or the co-tenants' rights under their deeds. Finally, Beesley and Driscoll assert that their right to complete construction of the pond has not been abandoned or waived, and they are not estopped or barred by laches. The Hanishes and the Kroegers, naturally, dispute all these contentions.

## I. BEESLEY'S AND DRISCOLL'S RIGHT TO CONSTRUCT POND

Beesley and Driscoll contend that they have the right to construct the pond because of their status as lot owners of properties adjacent to the pond parcel.[6] The court concluded that Beesley and Driscoll needed the unanimous consent of all the owners of lots bordering the pond parcel to construct a pond on that parcel. The court did not explain the factual and legal bases for its conclusion. In fact, there is a dearth of rationale in this case. Ordinarily, we would not decide any point or issue not decided in the trial court. Rule 1085. In the interest of judicial economy, we will consider the only basis upon which the trial judge could have been relying.

A ruling that one owner of an interest in real estate obtain the unanimous consent of other owners necessarily implies the court made two findings to support its conclu-

---

ing of an entire action is not a final judgment, and hence not appealable. If, however, "the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment as to one or more but fewer than all of the claims or parties." Rule 2–602(b)(1). The March order made the express findings required under Rule 2–602(b)(1) for finality.

6. Beesley and Driscoll also assert that they have the right to construct the pond because M.I.I. delegated its responsibility to them. The trial court did not rule on this issue, and we will not reach it. Rule 1085.

sion: first, some of the parties are tenants in common and second, Beesley's and Driscoll's plan to construct the pond interferes with the common law and deed rights of the other co-tenants. We will examine each of these findings in detail.

### A.   Tenancy in Common

A tenancy in common is a relationship among owners of property. It is created where several persons concurrently hold an estate in land by several and distinct titles with only a unity of possession. 2 Tiffany, *Real Property* § 426 (3rd ed. 1939, 1986 Cum.Supp.). There may be disunion of time, interest, title, source and quantity of estate so long as the several owners are united by their present right to possess and enjoy the whole property. 2 Tiffany at § 426.

In the case *sub judice*, M.I.I. owned the pond parcel, the access strip and the surrounding lots. M.I.I.'s conveyance of interests in the pond parcel, as first set out in the Welton deed, provided:

> "*MARTINGHAM INN, INC.* ... does hereby grant, convey and release, subject to the Affirmative Obligations, Restrictions, and Conditions hereinafter set forth ... in fee simple, an undivided *one-fifteenth interest* in all those parcels of land being a pond and adjacent land together with a forty-foot-wide ... strip of land ... said pond area being adjacent to Lots 25 through 31 and Lots 33 through 40, both inclusive....
>
> \*     \*     \*     \*     \*     \*
>
> "... Fishing, swimming, and use of small, non-motor driven boats is permitted in the pond, provided such use is in a reasonable manner so as not to diminish or destroy the enjoyment of the pond by the adjacent property owners....
>
> \*     \*     \*     \*     \*     \*
>
> "... The subject pond is reserved for the sole use and enjoyment of the property owners of the above enumerated lots and their guests.
>
> \*     \*     \*     \*     \*     \*

"*AND* the said *MARTINGHAM INN, INC.* ... hereby agrees and covenants for itself, its assigns and successors in Interest to convey a similar undivided one-fifteenth Interest in the pond area and adjoining land as hereinbefore described with, and indivisible from, each lot numbered 26 through 31 and 33 through 40, both inclusive; *it being the intention of the Grantor that the adjoining lot owners shall own in its entirety an undivided interest in the pond area, adjacent lands, and forty-foot wide parcel.*" (Emphasis in original.)

■ M.I.I. expressly deeded out only five of the undivided one-fifteenth interests in the pond parcel, although in two of those deeds it had covenanted to convey the remaining one-fifteenth interests. Those lot owners who have a deeded one-fifteenth interest, together with those who can establish their right to such interest,[7] "own in its entirety an undivided interest in the pond area," "reserved for the[ir] sole use and enjoyment" as long as they do not "diminish or destroy the enjoyment of the pond...." This language manifests M.I.I.'s intent to create a relationship between the various owners of lots surrounding the pond parcel in which each has a right to possess and enjoy, without excluding the others, the pond and adjacent land. Hence, M.I.I.'s grants effected a unity of possession at least among some of the lot owners creating a tenancy in common.

■ Any person who purchases a share of a tenancy in common becomes a co-tenant with the other owners. 86 C.J.S. *Tenancy in Common* § 8b (1954). As we stated, the Hanishes hold a deed expressly conveying an undivided one-fifteenth interest in the pond parcel. The Kroegers' deed referenced the covenants and restrictions in the Welton deed but failed to convey title to an interest in the pond

---

7. We do not decide here whether the lot owners without a grant in their deed of an undivided one-fifteenth interest in the pond parcel, including appellees Kroegers, have any title, equitable or otherwise, to a portion of the pond parcel. No one has challenged the Kroegers' standing, however, to sue for declaratory and injunctive relief.

parcel. Of the five deeds held by Beesley and Driscoll, only the deed to lot 36 provides an express conveyance of an undivided one-fifteenth interest in the pond parcel. Thus, of the parties to this appeal, only the Hanishes and Beesley and Driscoll are co-tenants of record. Accordingly, at least the Hanishes and Beesley and Driscoll can assert their rights under the co-tenancy.

### B. Prejudice to Co-Tenants' Rights

Tenants in common are equally entitled to the use, benefit and possession of the whole common property, *Cook v. Boehl,* 188 Md. 581, 592–93, 53 A.2d 555 (1947), provided they do not interfere with the rights of their co-tenants to do the same. *Dalton v. Real Estate and Improvement Co. of Baltimore City,* 201 Md. 34, 44, 92 A.2d 585 (1952). Interference can occur with a co-tenant's common law rights to enjoy the property or with any rights that were expressly given to a co-tenant in a deed. A tenant may, however, contravene these co-tenant rights with the consent of his or her co-tenant(s). *See Susquehanna Transmission Co. v. St. Clair,* 113 Md. 667, 672, 77 A. 1119 (1910). Hence, where several tenants jointly own the property, as in the case *sub judice,* one tenant may not prejudice the rights of the others without their unanimous consent.

The trial judge held that Beesley and Driscoll needed the unanimous consent of the affected lot owners in order to build the pond. Implicit in this conclusion is the finding that their plan to construct a pond prejudiced the rights of their co-tenants. Since he did not state whether Beesley and Driscoll interfered with the co-tenants' common law rights or instead with their rights emanating from their deeds, we will consider the effect of Beesley's and Driscoll's planned activities on both types of rights.

### 1. Common Law Rights

Beesley's and Driscoll's proposal involves acts affecting the common property. When an act of ownership is contrary to the co-tenant(s)' rights in a way that it alters the

character of the common property, it typically involves the commission of waste. There are several types of waste, two of which could be applicable to the instant case: voluntary waste consists of doing some act of destruction and meliorating waste is an act to change the character of the property that increases its pecuniary value. 93 C.J.S. *Waste* § 1 (1956).

■ In Maryland, a tenant is liable for the actual damages suffered by the property caused when he or she commits waste. Md.Real Prop.Code Ann. § 14–102(a) (1974, 1981 Repl.Vol.). The right to sue for waste generally encompasses the right to restrain its commission. 86 C.J.S. *Tenancy in Common* § 96(a) (1954); *e.g., Redwood Hotel, Inc. v. Korbien,* 195 Md. 402, 410, 73 A.2d 468 (1950) (landlord's action to enjoin tenant from continued commission of waste); *see also* Md.Real Prop.Code Ann. § 14–102 (1974, 1981 Repl.Vol.) (providing damages for waste committed after an injunction to stay waste). Hence, a court has the power to grant an injunction in favor of a tenant against a co-tenant for waste committed on the common property.

■ While Beesley's and Driscoll's planned activities on the pond parcel might technically satisfy the definitions of voluntary and meliorating waste, we hold that an alteration of the use of the common property to its intended use—the use covenanted for in the deeds to that property—does not constitute either form of waste under the facts of this case.

Maryland case law and logic support our holding that the conversion of the common property to its intended state does not constitute waste. In *Susquehanna Transmission Co.,* 113 Md. at 667, 77 A. 1119, a public utility and a farmer were co-tenants of a parcel of land which for many years had been used for farming. The utility sued to enjoin the farmer from preventing it from installing telephone poles and transmission lines on the common property. The Court of Appeals recognized that the utility's contemplated use "would be a diversion of the property from its former use"

and held that "[o]ne tenant in common has no right to alter or change the property to the injury of the other without his assent." *Susquehanna Transmission Co.*, 113 Md. at 672, 77 A. 1119.

In that case, the utility company attempted to alter the common property from its former use to a new unintended use. In contrast, in the case *sub judice,* Beesley and Driscoll propose to alter the common property by carrying out M.I.I.'s statement in the Welton deed and those that referenced it—that the tenants of the pond parcel have an ownership interest to enjoy and manage a completed pond. The only means available for the tenants to be able to exercise their rights to use and enjoy a pond is to alter the parcel's present character and construct a pond. Ordinarily, the clearing of the parcel and excavating in preparation for a pond would constitute voluntary waste since Beesley and Driscoll would be destroying the present nature of the property. In addition, improvement of the property with the resultant pond might meet the definition of meliorating waste since it changes the character of the property while increasing its pecuniary value. Beesley's and Driscoll's alteration of the property, however, will realize the intended use of that property. It would be illogical for their acts to constitute waste. Otherwise, the tenants would forever be foreclosed from enjoying their rights to a pond under the tenancy in common. We therefore hold that Beesley's and Driscoll's planned conversion of the pond parcel from its unintended partially excavated state to property with a completed pond is not voluntary or meliorative waste.

We conclude that Beesley's and Driscoll's construction of the pond would not constitute waste and therefore does not prejudice the co-tenants' common law rights to prevent waste on the pond parcel. Hence, Beesley and Driscoll do not need the unanimous consent of the lot owners on that basis.

## 2. Rights Emanating from Deed

The Hanishes and the Kroegers also contend that Beesley and Driscoll are interfering with the right given to them under their deeds which requires the unanimous consent of the affected lot owners. They contend that unanimous consent is a prerequisite to the building of a pond. We disagree.

The Welton deed provided in pertinent part:

"1. *Construction and Maintenance.* Construction, filling, and maintenance of the pond for a period of one year after completion of construction shall be the sole responsibility of Martingham Inn, Inc. ... Costs of all maintenance of the slope, bottom and banks of the pond after the expiration of one year from the date of completion shall be the equal responsibility of the owners of Lots 25 through 31 and 33 through 40, Section 3, both inclusive.

\* \* \* \* \* \*

"6. *Management.* The pond area shall be managed in accordance with the majority vote of the adjacent lot owners, however, no vote or action taken by the majority shall increase, decrease or alter the rights or obligations of the parties herein."

The Hanishes and the Kroegers seize the phrase in paragraph 6 that "no vote or action taken by the majority shall increase, decrease or alter the rights or obligations of the parties herein," and argue it requires Beesley and Driscoll to obtain unanimous approval of their plan. Paragraph 6, however, is preceded by paragraph 1 which addresses construction and maintenance of the pond. Paragraph 6 clearly contemplates the existence of a completed pond. One right which even a majority cannot alter then is to have a pond in the first place. Hence, paragraph 6 does not require unanimous consent in this situation. Although the initial construction of the pond, unlike the future management of it, does not necessitate even majority approval, we note that Beesley and Driscoll did consult with the other lot

owners and were able to obtain a majority vote in favor of their proposal.[8]

■ In summation, as tenants in common Beesley and Driscoll have a right to improve the common property with a pond provided they do not prejudice their co-tenants' rights. Beesley's and Driscoll's plan poses no injury to the other tenants' common law rights to prevent waste because their alteration of the pond parcel to its intended use does not constitute voluntary or meliorating waste. Neither is the proposal detrimental to the co-tenants' rights under their deeds. Therefore, Beesley and Driscoll have the right to construct the pond on the pond parcel.

## II. EQUITY BAR

Beesley and Driscoll also allege that not only do they have the right to construct the pond because of their status as co-tenants, but equity poses no bar to the assertion of their right. The Hanishes and the Kroegers counter that any right of Beesley and Driscoll to complete the pond is barred by the doctrines of abandonment, waiver, estoppel or laches. Although the trial court did not state that equity prevented the pond construction, we examine the four theories proposed by the pond opponents to demonstrate that these theories could not have supported the court's decision to grant an injunction.

### A. Abandonment

The Hanishes and the Kroegers contend that the co-tenants have abandoned their rights to ownership of the pond parcel because over 10 years have elapsed since the pond

---

8. Beesley and Driscoll claim that by any of the following definitions used to determine entitlement to vote on the completion of the pond, whether it be by lot owners, lot owners that have express conveyances of one-fifteenth interests in the pond parcel, lot owners whose chains of title include a reference to M.I.I.'s covenants in the Welton deed, or record owners of one-fifteenth interests in the pond parcel, including M.I.I., the outcome is the same. In all cases, a majority voted to approve completion of the pond and in no case was the approval vote unanimous.

was promised to be completed and no owners have taken any action, until now, to enforce their rights to a pond. For principles of abandonment to be applicable, one party must have voluntarily surrendered his or her property interest with an intent to terminate his or her ownership interest in the property. *Messersmith v. Mayor of Riverdale*, 223 Md. 323, 326, 164 A.2d 523 (1960). Long continued non-use of the property, without other evidence, is insufficient to establish an intent to abandon the right to the property. *Messersmith*, 223 Md. at 326, 164 A.2d 523.

■ None of the property owners in the case *sub judice*, including the Hanishes, Kroegers, Beesley or Driscoll, have evidenced an intent to abandon their ownership interest in the pond parcel. Quite the contrary, four of the five original lot owners who received their grant of the one-fifteenth interest in the pond parcel from M.I.I. reconveyed the same grant in the deeds they gave to their successors. Moreover, several lot owners exercised rights of ownership when they prevented a non-party from using the pond parcel in 1982, and when they authorized Beesley and Driscoll to construct the pond in 1985.

## B. Waiver

Unlike abandonment of a property interest, waiver of a right involves " 'the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.' " *Dahl v. Brunswick Corp.*, 277 Md. 471, 486, 356 A.2d 221 (1976), quoting *BarGale Indus. v. Robert Realty Co.*, 275 Md. 638, 643–44, 343 A.2d 529 (1975). In the instant case, the Hanishes and the Kroegers bore the burden of establishing that each tenant waived his or her rights to use and enjoy a pond on the pond parcel.

■ Hanish, Kroeger and Welch each testified that he does not want a pond and prefers the pond parcel as it presently exists, expressly waiving any rights he has to a

completed pond. The only evidence generated regarding
the intent of the other tenants was that none of the present
lot owners, or their predecessors, had sought to compel
M.I.I. to complete the pond. An extended lapse of time in
which a party has failed to assert his or her rights, coupled
with no further evidence, however, does not constitute a
waiver. *Dahl,* 277 Md. at 487, 356 A.2d 221. There being
no evidence presented of any acts by Beesley and Driscoll
or any of the other present or prior lot owners demonstrat-
ing an intent to waive their rights to a completed pond, the
doctrine of waiver does not support the injunction.

## C. Equitable Estoppel

The doctrine of equitable estoppel requires that a
party relied to his or her injury on a representation given by
another party. *Dorsey v. Beads,* 288 Md. 161, 171, 416 A.2d
739 (1980). The party sought to be estopped must have
made the representation to the party raising the issue of
estoppel. In the case *sub judice,* the Hanishes and the
Kroegers seek to estop Beesley and Driscoll from exercis-
ing their rights to construct a pond on the common proper-
ty. We hold equitable estoppel is inapplicable because no
representation was made by anyone of an intent to keep the
parcel in its wild state and, assuming for argument that a
representation was made, the Hanishes and the Kroegers
have failed to allege they relied on any statement to their
injury.

There is no evidence that any co-tenants, prior or current,
represented to the Hanishes or the Kroegers that they
intended to maintain the pond parcel in its natural state.
The Hanishes and the Kroegers claim that by leaving the
pond parcel in its "wild and unsophisticated" state for
prospective purchasers to view, the tenants represented
their intent to keep the parcel as it exists. As a matter of
law, however, the Hanishes and the Kroegers cannot rely
on the inaction of their co-tenants in this situation. The
Court has made it clear that mere silence of the party
asserting its rights "will not raise an estoppel where there

is no duty to speak or act." *Dahl*, 277 Md. at 488, 416 A.2d 739. Only where the silence or inaction constitutes a fraud will it operate as an estoppel against the silent party. *Mason v. Dulaney*, 144 Md. 108, 113, 124 A. 390 (1923). There was no allegation or evidence in this case that Beesley, Driscoll or any other party with an interest in the pond committed a fraud on the Hanishes or the Kroegers.

In addition to inaction, the Hanishes and the Kroegers point to the fact that the grantors of their lots verbally suggested that they intended to keep the parcel in its natural state. We do not agree with their interpretation of the statements. Hanish testified to his understanding with regard to the pond area at the time he and his wife purchased their lot: "I was informed by . . . the owner of the property, that that was the way [the pond area] was. I had no idea that it would ever be changed." Kroeger testified to a similar conversation with the prior owner of his lot. There is simply no evidence that these statements amounted to representations that the co-tenants intended to keep the parcel in its current state.

Even assuming the Hanishes and the Kroegers established a representation was made, they failed to allege, much less establish, any reliance to their detriment caused by words or acts of Beesley and Driscoll, as the parties sought to be estopped, or of any prior or current lot owners. These opponents never stated that they would not have purchased the property but for a representation concerning the pond parcel. Hence, neither the Hanishes nor the Kroegers established reliance to their detriment and estoppel is unavailable.

### D. Laches

Laches involves an inexcusable delay in asserting one's rights that causes prejudice to another party. *Bradford v. Futrell*, 225 Md. 512, 525, 171 A.2d 493 (1961). A determination of whether there is undue delay depends on all the facts and circumstances peculiar to each case. *Day v. Day*, 237 Md. 229, 236, 205 A.2d 798 (1965). For a delay to bar a

party from asserting his or her rights, the court must find prejudice or injury to the party raising laches. *Boyd v. Mercantile-Safe Deposit & Trust Co.*, 28 Md.App. 18, 26, 344 A.2d 148 (1975).

In the case *sub judice*, the court found that 10 years had elapsed since M.I.I. made its last conveyance of properties bordering the pond parcel, and although the pond was to be constructed by May, 1975, the pond parcel has remained in its wild and unimproved state. The judge, however, did not find the delay unreasonable or inexcusable or that it caused prejudice to the Hanishes or the Kroegers. Even if we were to infer these findings from the court's issuance of the injunction and were to accept that 10 years constituted undue delay in this case, we could not find laches. The record is simply barren of evidence to support the requisite finding of prejudice to the Hanishes or to the Kroegers.

Prejudice to a party "is generally held to be anything that places him in a less favorable position." *Parker v. Board of Election Supervisors*, 230 Md. 126, 130–31, 186 A.2d 195 (1962). The Hanishes and the Kroegers presented no evidence that Beesley's and Driscoll's delay in asserting their rights to construct the pond caused them injury. In fact, the only step the Hanishes or the Kroegers took that related to their belief that the pond parcel would remain as they saw it was the original purchase of their lots in 1981. As we stated, the Hanishes and the Kroegers have not suggested, however, that they would not have purchased their lots if their prospective neighbors had been attempting to enforce their rights to have a completed pond. "So long as the position of the parties is not changed and there is no prejudice from the delay, laches is inapplicable." *Boyd*, 28 Md.App. at 26, 344 A.2d 148.

In summation, we hold that Beesley and Driscoll, as tenants in common, have a right to enter the pond parcel and use it in a way consistent with the intended use of the common property as expressed in the Welton deed, and they

have not abandoned or waived in any way their rights to a completed pond. Nor are they estopped or barred by laches from asserting those rights. Hence, the injunction should not have issued in this case.

As a final note, we see no economic loss resulting from our holding that the lot owners who otherwise could not realize their promised pond from the defunct developer will soon enjoy the use of a pond at a relatively small projected maintenance cost. In addition, it is likely that the lot owners will benefit financially from the construction of the pond. There was expert testimony presented that the lots bordering the pond parcel have in the past been more difficult to resell than other lots in the area. M.I.I. expected the pond to increase the value of the lots and Beesley and Driscoll hope to reimburse themselves for the costs of constructing the pond from the value increase a finished pond will bring to their adjacent lots. Not one of the lot owners has testified or argued that his or her property will diminish in value due to the installation of the pond.

Moreover, the affected lot owners have all had the opportunity to express their objections to the plan. Beesley and Driscoll have modified the specifications at an increased cost to themselves to accommodate their neighbors' concerns. They have also agreed to retain the trees on the north end of the parcel that provide a natural barrier for the Hanishes and the Kroegers. Finally, Beesley and Driscoll are making efforts to construct the pond properly. They have contacted several public agencies and obtained the necessary permits, and have consulted with two local environmental firms and three contractors. Thus, not only are Beesley and Driscoll within their legal rights to construct the pond, but they have so far exercised good faith in executing their plans, and it appears that their plan will financially benefit all involved.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEES.

HAUL CREEK

AREA A
5.541 AC.±

1C
2.136 AC.±

DEEP WATER

32
1.306 AC.±

SWAN ROAD

13
1.899 AC.±

31
1.385 AC.±

14
2.325 AC.±

30
1.112 AC.±

54
1.494 AC.±

15
2.822 AC.±

29
1.108 AC.±

33
1.130 AC.±

53
1.155 AC.±

16
2.152 AC.±

28
1.109 AC.±

34
1.070 AC.±

52
1.101 AC.±

17
2.074 AC.±

27
1.035 AC.±

35
1.100 AC.±

51
1.046 AC.±

18
2.066 AC.±

26
1.120 AC.±

36
1.097 AC.±

37
1.004 AC.±

TEAL

25
1.573 AC.±

24
1.135 AC.±

40
1.464 AC.±

39
1.030 AC.±

38
1.048 AC.±

22
2.286 AC.±

23
2.087 AC.±

45
2.465 AC.±

41
2.322 AC.±

CEMETERY
(AS NOW
OVER GROWN)

6' WIDE RIGHT OF WAY

42
2.845 AC.±

43
3.636 AC.±

44
3.221 AC.±

PART 5?
PL 25/66
Recd. 9-1-71
"Section No. Three" of 3 ?
MARTINGHAM A Subdivision
in the 2d Dist. Talbot County, Maryland
J.R. McCrone, Jr., Inc.
July 1971

# SECTION NO. THREE OF