ESTATE OF WILLIAM Y. KITCHIN, DECEASED, JOHN R. SHEMATZ, JOHN G. GOETTEE AND FARMERS NATIONAL BANK, PERSONAL REPRESENTATIVES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kitchin v. Commissioner
Docket No. 41118-85.
United States Tax Court
T.C. Memo 1987-324; 1987 Tax Ct. Memo LEXIS 324; 53 T.C.M. (CCH) 1275; T.C.M. (RIA) 87324; June 29, 1987. John R. Shematz, for the petitioner. Deborah Clark, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioner's Federal estate tax in the amount of $61,150.78. The issue we must decide is whether decedent's one-third fee interest in White Hall Farm, which he transferred to his son-in-law in 1975, is includable in his estate either as a retained life estate pursuant to section 2036(a)(1) [1] or as a revocable transfer pursuant to section 2038(a)(1). FINDINGS OF FACT Some of *326 the facts have been stipulated and are so found. William Y. Kitchin ("decedent") died on April 5, 1982, at the age of 76. Decedent's estate had its principal office at Annapolis, Maryland at the time the petition was filed. Decedent's wife, Elizabeth Virginia Talbott Kitchin ("Virginia"), died in 1971. At the time of her death, Virginia owned in fee simple a 147.5 acre farm in Dunkirk, Maryland known as White Hall Farm ("White Hall"), improved by a substantial manor home. Virginia died intestate and, pursuant to Maryland law, her fee interest in White Hall passed one-third to decedent and two-thirds to decedent's and Virginia's daughter, Mary Elizabeth Eisenman ("Mary Elizabeth"). [2] On January 20, 1972, a deed was executed conveying to decedent an undivided one-third fee interest and to Mary Elizabeth an undivided two-thirds fee interest as tenants in common in White Hall. Mary Elizabeth, her husband Richard L. Eisenman ("Richard") (together "the Eisenmans") and their children have resided at White Hall since 1969. After Virginia's death in 1971, decedent moved to White Hall and *327 subsequently sold his home in Annapolis. He continued to reside at White Hall until his death. In 1971, the Eisenmans and decedent contracted to have a two-story frame addition built onto the home at White Hall. Decedent paid the contract price of $26,800.00. The addition consisted of a bedroom and bathroom upstairs and a living room, dining room and kitchenette area downstairs. The addition had its own entrance and was also accessible through the main house. Decedent lived in the addition but took his meals in the main house with the Eisenmans. From 1970, decedent and the Eisenmans were engaged in real estate development through Ferry Landing Woods, Inc. ("Ferry Landing Woods"), in which each owned a one-third interest. Prior to becoming a real estate developer, Mary Elizabeth was a judge on the Orphan's Court of Calvert County, Maryland. [3]
In *328 1974, decedent and Mary Elizabeth executed a covenant not to encumber or convey White Hall in favor of the Farmers National Bank of Annapolis ("Farmers National Bank") in exchange for a $20,000.00 loan. The loan was used in the activities of Ferry Landing Woods. On October 18, 1974, decedent and the Eisenmans gave a mortgage on White Hall to Farmers National Bank to secure a $100,000.00 loan which subsumed the previous $20,000.00 loan. This loan was used for Ferry Landing Woods' projects. Farmers National Bank required White Hall as collateral for the loan because the real estate market was poor and Ferry Landing Woods was having financial difficulties. In 1975, decedent offered to sell his one-third interest in White Hall to Richard. On June 5, 1975 decedent entered into an agreement with the Eisenmans (the "Agreement") pursuant to which decedent would transfer his interest in White Hall to his daughter and son-in-law. Decedent entered into the Agreement to arrange for his maintenance, care and support during the rest of his life. He also wanted to be released from liability on the loan from Farmers National Bank. In consideration for decedent's conveyance of his one-third *329 interest in White Hall, the Eisenmans agreed to provide decedent a home in pleasant, comfortable and congenial surroundings as a member of their family for the rest of his life and to provide additional compensation to be agreed upon later. The Agreement further provided for reconveyance of the property to decedent upon his written demand if the Eisenmans did not comply with its terms: It is expressly understood and agreed that in the event of any failure or default by the [Eisenmans] in the performance of any promise or agreement on their part contained herein, then in such event such real estate shall revert to the [decedent] upon his written demand therefore [sic], and the [Eisenmans] shall thereupon reconvey the aforesaid one-third interest to [decedent], and in any such event, [decedent] shall thereupon again be and become the owner of his interest in the aforesaid real estate. [4]
*330 On September 16, 1975, decedent deeded his one-third interest in White Hall to Richard [5] for $10.00 and "other good and valuable consideration." Also on September 16, 1975, Mary Elizabeth and Richard gave a mortgage on White Hall to secure a $125,000.00 loan from the Southern Maryland Federal Land Bank of Baltimore ("Federal Land Bank"). The Federal Land Bank issued three checks at the settlement: (1) to the Eisenmans and a law firm that closed the loan in the amount of $3,354.08; (2) to the Eisenmans, decedent and Farmers National Bank in the amount of $96,700.45; and (3) to the Eisenmans and decedent in the amount of $17,601.72. The check for $3,354.08 was endorsed to the law firm. The check for $96,700.45 satisfied the mortgage at Farmers National Bank which released the covenant not to encumber or convey White Hall. The release was recorded on September 16, 1975. The third check, for $17,601.72, was endorsed over to decedent as part of the additional compensation for the transfer of his interest in White Hall to Richard. [6] Decedent's release from liability for one-third of the $96,700.45 principal due on the mortgage, or $32,233.48, constituted the remainder of the consideration *331 for the transfer. *332 After Virginia's death in 1971, White Hall was appraised at $161,000.00, which was the value reported on the probate inventory. By 1975, Mary Elizabeth estimated that the value of White Hall had declined to $150,000.00 despite the addition to the house in 1971 because the manor house was in very bad condition. Because she was a local land developer and as such was aware of land values in the area, we accept her estimate as the approximate value of White Hall in 1975. In addition, respondent presented no evidence to challenge or contradict Mary Elizabeth's valuation. We, therefore, find that when decedent transferred his interest in White Hall to Richard in 1975, White Hall had a fair market value of approximately $150,000.00 and decedent's one-third fee interest had a value of approximately $50,000.00. Before and after 1975, decedent made advances of cash and other property from his personal assets to Ferry Landing Woods. After the Eisenmans repaid the mortgage held by Farmers National Bank in 1975, decedent and the Eisenmans took out a series of six-month loans for the use of Ferry Landing Woods. Each loan was repaid, renewed or increased every six months, and a new loan *333 agreement was signed each time. The Eisenmans were not required to put up White Hall as collateral for the loans because Ferry Landing Woods was at that time in better financial condition and other corporate assets were used as collateral. Subsequent to decedent's transfer of his interest in White Hall, decedent demanded that Ferry Landing Woods repay the advances he had made and redeem his one-third interest. On June 25, 1977, Ferry Landing Woods settled with decedent and agreed to pay decedent a lifetime annuity based on an age of 72. The annuity was derived from Internal Revenue Service life expectancy tables, section 20.2031-7, Estate Tax Regs. Decedent was an alcoholic in 1975 but by 1978 he had stopped drinking and was attempting to determine his financial situation. Decedent decided that he had not been adequately compensated for his interests in White Hall and Ferry Landing Woods. Through his accountant, John Goettee, decedent sent a letter dated July 17, 1978 to the Eisenmans stating that decedent had deeded his interest in White Hall to the Eisenmans to enable Ferry Landing Woods to qualify for a mortgage from the Federal Land Bank. The letter also included a list *334 of payments made by decedent to Farmers National Bank on behalf of Ferry Landing Woods between 1974 and 1977 for which decedent claimed he had not been reimbursed, a list of repayments made to decedent and a statement of decedent's equity interest in Ferry Landing Woods. When the Eisenmans received the letter, they reviewed the numbers and found numerous errors. They met with Goettee to review decedent's computations. At the meeting the parties agreed to strike several payments from the list because they had already been reimbursed and to reduce the amount claimed by certain other payments made by the Eisenmans. The $50,000.00 that decedent claimed as the value of his interest in White Hall was also eliminated because White Hall was not a corporate asset and because decedent did not own an interest in White Hall after 1975. After corrections the parties determined that decedent's interest in Ferry Landing Woods had a value of $108,000.00. Decedent was compensated for his interest, which the Eisenmans had previously agreed to buy out, through the annuity payments Ferry Landing Woods had begun making to him in 1977. The Eisenmans received a second letter from Goettee on behalf *335 of decedent in late 1980. The letter stated, in relevant part, as follows: November 24, 1980 Dear Folks: Dr. Kitchin has asked me to state a proposition to Mary Elizabeth respecting the disposition of his estate at the time of his death - it is this: There are a number of stocks and bonds on which Mary Elizabeth is joint owner with Dr. Kitchin. He asks two things of her, and you, Dick. That is, that she sign off on all of them and the two of you deed to him his quarters which he added onto White Hall in 1971 together with its contents and rights-of-way in front and in the rear of said addition so he can park his car. And for this, he will leave Mary Elizabeth a life interest in his whole estate when he dies. Should the two of you decline to do this, he will probably find other quarters in which to live and ask that he be compensated for his following properties: * * * 4) The cost of the addition to White Hall for which he paid $36,611.30. [7] He paid real estate taxes for two years on White Hall and paid for front sidewalks and a light. 5) His 1/3 interest in White Hall which he deeded to Dick on September 16, 1975, which states - "a certain compensation to be agreed *336 upon by the parties." He thinks the compensation would be on the basis of what the County paid for the adjoining property, i.e., $2,300.00 per acre. On this basis the compensation should be $115,767.00. He acknowledges a credit on this of $15,082.58 which was the proceeds of refinancing the Federal Land Bank Mortgage in 1975. [8]
He suggests that for Mary Elizabeth to sign off the securities and the two of you to deed him his quarters, would be the least painful of the two choices and suggests you give this your earnest attention. Yours very truly, John Goettee When they received the letter Mary Elizabeth thought that decedent was confused and had "lost his mind" because the Eisenmans had already settled with decedent on White Hall. Mary Elizabeth believed that she and Richard had compensated decedent fairly for his interest in White Hall and were complying with the terms of their 1975 agreement to provide decedent a comfortable home with them for the remainder of his life. The Eisenmans did not respond to the letter. *337 Decedent next had Goettee draft a Codicil to his will dated May 20, 1981. In the Codicil decedent devised a life estate in his one-third interest in White Hall to his grandsons, remainder to his brothers and sisters. In addition, he bequeathed shares of stock to his sister that had been redeemed several years before his death. Mary Elizabeth testified that toward the end of his life decedent was confused and believed that he owned assets that he did not in fact own. In 1978, property values began to climb rapidly and the Eisenmans mortgaged White Hall in exchange for a $225,000.00 loan which they used to completely renovate the manor house. In 1981, the improvements at White Hall were assessed for property tax purposes at $272,245.00, and the entire property was assessed for property tax purposes at $367,085.00. Based on comparable sales, respondent determined that the fair market value of the 147.5 acres in 1981 was $2,000.00 per acre and that the total value of White Hall was $567,345.00. Decedent died on April 5, 1982 and his estate timely filed an estate tax return on January 5, 1983. The fair market value of White Hall was not included as part of decedent's estate. *338 In his notice of deficiency, respondent determined that the value of decedent's one-third interest in White Hall at the time of his death, which was fully includable in decedent's estate, was $189,115.00. OPINION Petitioner contends that decedent's transfer of his one-third interest in White Hall was a "bona fide sale for an adequate and full consideration in money or money's worth." Section 2036(a); section 2038(a). If so, neither section 2036 nor section 2038 requires any part of the value of decedent's interest in White Hall to be included in his estate. Respondent argues that decedent did not receive adequate and full consideration for his interest in White Hall. Consequently, respondent argues, because decedent retained a life estate in his interest in White Hall within the meaning of section 2036(a)(1) or made a revocable transfer within the meaning of section 2038(a)(1), the fair market value of decedent's one-third interest as of his date of death, less any consideration received in the transfer, is includable in decedent's estate. See section 2043(a). On June 5, 1975, decedent entered into an agreement with the Eisenmans to transfer his one-third fee interest in *339 White Hall to them. As consideration for the transfer, the Eisenmans agreed (1) to pay certain compensation to be agreed upon by the parties, and (2) to provide a home for decedent for the remainder of his life in "pleasant, comfortable and congenial surroundings" in their home and as a member of their family. On September 16, 1975, decedent received the agreed upon compensation and deeded his interest in White Hall to Richard. Decedent received $17,601.72 in cash and was relieved from liability on the loan secured by the mortgage on White Hall held by Farmers National Bank. The principal due on the mortgage as of September 16, 1975 was $96,700.45. Decedent was liable for repayment of one-third, i.e., $32,233.48. Decedent thus transferred his fee interest in White Hall, valued at approximately $50,000.00 in 1975, in exchange for approximately $50,000.00 consisting of $17,601.72 in cash and cancellation of indebtedness income in the amount of $32,233.48. Decedent's retained life estate in White Hall, see section 2036(a)(1), also part of the consideration received by decedent, cannot be taken into account for estate tax purposes as consideration for transfer of that property. *340 Estate of Gregory v. Commissioner,39 T.C. 1012, 1017 (1963); see United States v. Past,347 F.2d 7, 12-14 (9th Cir. 1965). As a co-tenant of White Hall, decedent had the right to occupy the entire property subject only to the right of the other co-tenants to do the same. Beesley v. Hanish,521 A.2d 1235, 1240, 70 Md. App. 482 (1987). Excluding the value of the retained life estate, [9] decedent thus received $49,895.20 as consideration for his property valued at approximately $50,000.00. We conclude that the $49,895.20 consideration received approximates the value of decedent's interest sufficiently well as to constitute "adequate and full consideration in money or money's worth." See section 2036(a). Mary Elizabeth, who was in real estate development, valued White Hall at approximately $150,000.00 in 1974 based largely on the poor *341 condition of the manor house at that time. Respondent's cross-examination left her estimate of value intact. We accept Mary Elizabeth's approximation as the value of White Hall in 1975, and we conclude that $49,895.20 was the fair market value of decedent's one-third interest in the property. Consequently, we hold that decedent's transfer of his interest in White Hall in exchange for $49,895.20 was for "adequate and full consideration in money" within the meaning of section 2036(a) and section 2038(a). The one-third interest in White Hall is, therefore, not includable in decedent's estate. [10]
Decision *342 will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. See Md. Est. & Trusts Code Ann. § 3-102, § 3-103↩ (1974).
3. The Orphan's Court is a court of limited jurisdiction empowered to "conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent." Md. Est. & Trusts Code Ann. § 2-102(a)↩ (1974).
4. We note that the Agreement requires the Eisenmans to provide decedent with a comfortable home with them but does not require that the home be at White Hall. The Agreement also provides, however, that in the event the Eisenmans defaulted on their obligation, decedent could, on written demand, require that the interest in White Hall be reconveyed to him. That right might be illusory if the Eisenmans no longer owned White Hall and decedent could not obtain specific performance. Mary Elizabeth testified that the parties had not considered the wording of the contract very carefully, but that she and Richard had no plans to sell White Hall. When a term in a contract is ambiguous, parol evidence is admissible to clarify the parties' intent at the time they entered into the contract. 1616 Reminc Limited Partnership v. Commonwealth Land Title Ins. Co.,778 F.2d 183, 187 (4th Cir. 1985); Elrod v. Commissioner,87 T.C. 1046, 1066↩ (1986). We conclude that the parties intended to provide decedent with a home at White Hall for the remainder of his life.
5. The Agreement provided that decedent would convey his undivided one-third interest in White Hall to Mary Elizabeth and Richard. The deed, however, conveyed decedent's interest in White Hall only to Richard. Mary Elizabeth was the sole owner of an undivided two-thirds interest in the property, and she testified that she believed her father deeded his interest to Richard to enable White Hall to continue to operate as a partnership. ↩
6. Respondent argues that decedent received only $15,082.50 on September 16, 1975 and that he paid that amount on behalf of Ferry Landing Woods on September 22, 1975. Respondent relies on the testimony of John Goettee, decedent's accountant. Goettee testified that decedent told him he received only $15,082.50 at the settlement on September 16, 1975. A letter Goettee sent to the Eisenmans on decedent's behalf in 1980, see infra,↩ acknowledges receipt of only $15,082.50. Goettee, however, had a limited recollection of his specific dealings with decedent and the Eisenmans. In addition, he relied heavily on what decedent told him and did not perform any independent investigation of decedent's dealings with the Eisenmans. We found Mary Elizabeth to be a credible witness with a clear understanding and recollection of her business dealings with decedent, and we accept her testimony. We also note that the settlement sheet prepared by the attorneys who closed the loan lists $17,601.72 as the net amount due and paid to decedent. Mary Elizabeth added a note to the settlement sheet stating that the payment was in consideration for decedent's one-third share of White Hall. Although the settlement sheet was never signed, it was received in evidence without objection from respondent's counsel. The settlement sheet corroborates Mary Elizabeth's recollection of the agreement she and Richard entered into with decedent.
7. On his income tax return decedent stated the cost basis of the addition as $29,236.00. Decedent actually paid $26,800.00 for the addition. ↩
8. See note 6, supra.↩
9. Decedent was 70 years old at the time of the transfer. The present value of a life estate acquired after December 31, 1970 and before December 1, 1983 in property with a fair market value of $50,000.00 for a 70 year old man was $20,647.00. See section 20.2031-10(c), Estate Tax Regs.↩
10. If we had concluded that decedent had not received adequate and full consideration for his interest in White Hall, the value of the one-third interest in White Hall as of the date of decedent's death, less any consideration received at the time of the transfer, would be includable in decedent's estate. See section 2043(a); section 20.2043-1(a), Estate Tax Regs. As of the date of decedent's death, the one-third interest in White Hall had a fair market value of $189,115.00. That amount, less the $49,895.20 consideration received, would be includable in decedent's estate.↩