917 A.2d 1129

Stuart P. WHITE et al.

v.

The PINES COMMUNITY IMPROVEMENT
ASSOCIATION, Inc. et al.

No. 2652, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 6, 2007.

14

16

20

22

26

William M. Ferris, Todd D. Lochner, Tarrant H. Lomax, Steven P. Resnick (Nevin L. Young, Lynn T. Krauser, on brief), Annapolis, for appellant.

Christopher F. Drummond, Centreville, Mary E. Gleaves, Karl Gleaves, Arnold, for appellee.

Panel DAVIS, JAMES R. EYLER and WOODWARD, JJ.

DAVIS, J.

The Circuit Court for Anne Arundel County, by memorandum and order, ruled on December 28, 2005 in favor of appellees, the Pines Community Improvement Association, Inc.[1] Trial commenced on April 13 and 15 of 2005 and the trial court determined there were necessary parties unnamed in the action. The trial court, *sua sponte*, issued a Show Cause Order to all lot owners of The Pines on the Severn (hereinafter "The Pines") and a subsequent hearing was set to join all additional party defendants. Trial resumed December 21 and

---

1. "Defendant Interveners" at trial "Mary E. and Karl Gleaves," owners of lots 253 and 254 filed with the PCIA as "[a]ppellees, appearing *pro se*" in all briefs. We shall hereinafter refer to all collectively as "appellees" or the "PCIA" when applicable.

22, 2005, at which time evidence and testimony were taken in regard to the action filed on December 8, 2003 [2] and a cross-claim that was filed by appellees on July 8, 2005.

Following trial, the court adjudged that the Rices were not damaged by appellees nor did appellees trespass upon their land when the steps to pier one, discussed *infra*, were removed. Appellees' response to the motion of appellants to alter or amend judgment, filed January 19, 2006, concedes in a footnote that the trial court's Memorandum and Order did not expressly mention the Rice Triangle and offered the trial court its acquiescence for the trial court to amend its order "to reflect the Rices' adverse possession of the area covered by the studio.'" The trial court denied the motion on January 26, 2006.

The trial court found that the Pines Community Improvement Association owned, in fee simple, title to the contested property and all of the existing improvements thereon and appellants' claims of adverse possession and prescriptive easement were denied. Denied also were appellants' claims that a mortgage and subsequent deed granted them an interest in community land, piers and boathouses that differed from interests enjoyed by all residents. PCIA was granted the right, power and authority to use, control and regulate the community land and any improvement thereon including assignation of boat slips at piers and boathouses. PCIA was also granted rights power and authority to charge fees for costs associated with such regulation, including storage fees for noncompliance with assignment regulations.

Monetary judgments were recorded against the following appellants: Gill & Assocs., the Donnellys, the Garmans, the

---

2. The appellants in this appeal are Stuart P. and Sondra R. White (the Whites); Joseph and Cynthia Donahue (the Donahues); Michael and Jill Donnelly (the Donnellys); Gill & Associates (Gill & Assocs.); Gayle Clow (Clow); Steven Garman, Virginia E. Garman, Allen L. Garman, Sr., Allen L. Garman, Jr. (the Garmans); Keith and Dee Lyon (the Lyons); Douglas W. Johnston, Jr. (Johnston); William C. and Mary J. Simmons (the Simmons' s); Douglas C. and Stephanie S. Rice (the Rices); or collectively referred to as appellants.

Whites, Clow, the Lyons, Johnston, and the Donahues.[3]

All appellants noted timely appeals to this Court, filed five separate briefs [4] and have presented several questions for our review, which we restate as follows:

I. Are appellants entitled to ownership of Community Land and/or piers through adverse possession, an exclusive prescriptive easement, estoppel or alternatively by their predecessors extinguishing rights of common use?

II. Does the trial court's lack of factual and legal findings concerning the "Rice Triangle" require remand for further proceedings?

III. Did the trial court err in creating a new covenant eighty years after the original plats of the Pines were recorded and by awarding damages against appellants arising out of use of the piers?

IV. Is an association community landowner, which calls itself a Community Improvement Association, but does not qualify as a homeowners' association under Maryland Code Ann., Real Prop., § 11B–101, *et seq.*,[5] entitled to ignore or overrule covenants and a common development scheme expressly providing that the land it now holds is subject to a right of use by lot owners?

V. When a "community lot" is burdened by a covenant and common development scheme providing for the use of the property by all adjacent property owners in a designated plat area, may a volunteer organization which acquires title to the "community lot" control use of the lot to the extent of charging fees to the adjacent property owners for the use of

3. The Donahues, Donnellys, Garmans and Lyons were adjudged jointly and severally liable as to their monetary judgments discussed *infra.*

4. The Donahues, Donnellys, Garmans, Gill & Assocs. and Clow (the Donahue brief); The Lyons (the Lyon brief); Johnston and the Simmons (the Johnston brief); the Rices (the Rice brief) and the Whites (the White brief).

5. Unless otherwise indicated, the Court shall refer to Maryland Code Annotated, Real Property (2003 Repl.Vol.2006 Supp.).

the burdened property, making discretionary assignments of pre-existing piers and boathouses which were built by the adjacent property owners and by requiring that all adjacent lot owners who wish to exercise the right to use such piers and boathouses become members of the voluntary organization?

VI. Did the trial court abuse its discretion by failing to consider Simmons' testimony and documentary evidence and as to its manner and timing in which it concluded trial and entered its order?

## FACTUAL BACKGROUND AND
## PROCEDURAL HISTORY

"The Pines on the Severn" (hereinafter "The Pines") is a residential community of approximately 250 single family lots located in Arnold, Maryland that binds on two branches of Chase Creek, a tributary of the Severn River. The Pines was created by Leonidas G. Turner, principal of The Severn River Company and his wife, Amelia A. Turner, by recordation of two plats in 1922 and 1924, respectively, in the Land Records of Anne Arundel County. The plats depict a ring of Community Land [6] in the proposed development such that no single lot is binding on Chase Creek.

After January 27, 1926, The Pines Company, Inc. owned all of the unsold lots in The Pines. The deed recorded in February 1926 contained the following language in regard to the land conveyed:

and all parts thereof marked Community Land or Community Lot, and all the roads, ways, streets, lanes, alleys, and paths, piers, riparian and water rights appurtenant to said Community lands, streets, roads, lanes, ways, alleys, and paths, being subject to such rights therein as granted to the owners of such lots or parts of said tract in the deeds from

---

6. "Community Land" and "Community Lot" will be referred to hereinafter interchangeably as they relate to the ring of land separating lots from Chase Creek.

the said The Severn River Company heretofore executed and recorded.

Together with the rights, roads, ways, waters, water and riparian rights, streets, lanes, alleys, and paths, piers and appurtenances and advantages to the same belonging or in anywise appertaining and particularly the roads and ways leading from said property to the Baltimore and Annapolis Boulevard.

Early deeds from The Severn River Company conveyed to individual lot holders

also *the use in common with others* of the road extending from Chase Creek to the Baltimore and Annapolis Boulevard and also the *use in common with others* entitled thereto of the *lots of ground designated as Community Lot* on said Plat and all water and riparian rights incident thereto.

The PCIA was formed and incorporated in July of 1926 "[t]o control and care for the Community lots and beaches, the water supply, fire protection, sanitation, enforcement of restrictions, roads, police, lighting, legislation, transportation and all other matters in which the community interest as a whole is involved." Further, the certificate of incorporation allowed that the PCIA "shall have the right to acquire by purchase, lease or otherwise any land, building, property or real estate to be used for any purposes consistent with the powers as expressed in the charter of the said corporation." The corporation acknowledged that it was subject to the "General Laws of the State of Maryland." It is a voluntary membership organization that presently has a regular membership of approximately 114 lot owners and several appellants have been members and/or officers in the PCIA. The PCIA has a constitution, Bylaws and Rules and Regulations.

The membership roles have included the following appellant members [7] Rice in 2003; Donahue 1986–2003; Simmons from

---

7. Appellees' cross claim alleges that the Rices were current members and that for some years the PCIA did not post a member roster.

1969 to 1978, 1980, 1993, 1994, 2000–2004; Johnston 2002–03; Lyon 1990–2003; Clow 1996–97, 2000–2003; White 2002; Garman 2002; Donnelly 2001–2003; Gill 1967–71, 1973–78 and a resident of Gill & Assocs. Lot 617, Robert R. Nichols (hereinafter Nichols) 1988–89, 1995, 2000–02.

On October 12, 1926,[8] The Pines Company executed a deed granting PCIA lot number 406 as shown on the July 15, 1922 plat. The "BEING" clause included use in common language "with others entitled thereto of the lot of ground designated as 'Community Lot' on said Plat, and all water and riparian rights incident thereto." It continued, "[t]he said lot to be held by [PCIA] for the use of all owners of lots and also those who may acquire lots, as a single unit for the Pines Community purposes." The land was granted subject to covenants. The covenant language stated:

> TO HAVE AND TO HOLD the said lot of ground and premises above described and mentioned, and hereby intended to be conveyed, together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining, unto and to the proper use and benefit of the said Pines Community Association Incorporated, and for the title holders from The Pines Company, Incorporated, or Leondidas G. Turner, [sic] their successors or assigns, in fee simple, subject, however, to the following covenants, and agreements which are hereby entered into by the [PCIA], its successors and assigns, with the said The Pines Company, Inc., as part of the consideration of this deed.
>
> \*　　\*　　\*
>
> 8—That the said grantee doth hereby covenant and agree for itself, its successors and assigns, that the land hereby conveyed, shall be liable annually for the proportionate amount of the cost of maintaining the roads, included in the area of the Pines–on–the–Severn, for the total square feet in said lots said proportionate amount not to exceed, however,

---

**8.** The notary section of the deed states that it is 1927 and the following is on page 499 above the date of this deed "Recorded 14 October,— 1927—2:30 P.M."

the sum of Sixty-dollars ($60.00) to be paid annually on the 15th day of March, in each year, by the grantee, its successors and assigns, to the Pines Company, its successors and assigns, or to such person or body corporate, as it or they may direct.

\* \* \*

IT IS DISTINCTLY UNDERSTOOD AND AGREED BETWEEN the parties thereto, that all covenants and agreements above expressed, shall be held to run and bind with the land hereby conveyed, the acceptance of this deed, shall have the same effect and binding force upon the grantee, its successors and assigns, as if the same were signed and sealed by the said Pines Company, Inc, [sic] and of the grantee; provided however, that the covenants contained in this deed may be changed with the written consent of the said The Pines Company, Inc. and of the [PCIA], their successors and assigns.

In January 1928, to secure a $35,000 loan from Mary G. Machen, The Pines Company, Inc. executed a mortgage (hereinafter "the Machen Mortgage") in Machen's favor. Legal title to remaining lots in The Pines owned by The Severn River Company was conveyed that included the Community Land. The Machen Mortgage described "roads, ways, streets, lanes, alleys and paths, piers, riparian and water rights appurtenant to the land known as Pines On The Severn, subject however, to the use of the adjacent lot holders therein, and also all water works. . . ." The mortgagors defaulted on the Machen Mortgage and it was foreclosed upon in the early 1930's.

The lands described by the Machen Mortgage were conveyed to Pines–on–the–Severn, Inc. on July 19, 1932 and Pines–on–the–Severn subsequently sold approximately twenty lots in The Pines between 1932 and 1952. The deeds in these subsequent sales included the "use in common" language contained in the earlier deed from The Severn River Company and The Pines Company, Inc.

On September 3, 1952, Pines–on–the–Severn, Inc. conveyed all of its remaining lots to the Pumphreys and the Obrechts (hereinafter "the Pumphrey Deed"), including the Community Land and Community Lot. The deed made such conveyance "subject, however, to the rights of owners of property in the development to the areas designated 'Community Land' and 'Community Lot.'" The Pumphrey Deed also contained language granting an interest to Pines–on–the–Severn, Inc. in

roads, ways, streets, lanes, alleys and paths, piers, riparian rights and other rights appurtenant to the land known as Pines–on–the–Severn; subject, however, to the use of the adjacent lot holders therein, if any

\* \* \*

SEE the plats of Pines-on-the-Severn [sic] recorded among the PlatRecords [sic] of Anne Arundel County....

On April 23, 1962, Chas. H. Steffey, Inc. (hereinafter Steffey) obtained all remaining lots and on that same day conveyed them to White Acre, Inc. (hereinafter White Acre), who subsequently conveyed the Community Land and Community Lot to the PCIA on April 5, 1966. The conveyance was made "subject to such rights and privileges heretofore granted from time to time by the Grantor to others ... to use said property hereby conveyed for the purpose set forth by such grants." White Acre also reserved for lot owners in the new and adjacent subdivision, called Hidden Hills, the same rights and enjoyment of the Community Land and Community Lot as enjoyed by Pine–on–the–Severn's residents. White Acre had granted no others any rights or privileges in the Community Land or Community Lot.

Some lot owners built piers adjacent to their respective properties that abut the Community Land shown in the 1920's plats. At trial, appellees labeled piers adjacent to the numbered lots which we recreate as follows: Pier 1 adjacent to the Rices' lot 305; Pier 2 adjacent to the Donahues' lot 309; Pier 8 adjacent to the Simmons' lots 403–05 and part of lot 402; Pier 9 adjacent to Johnston's lots 401 and part of lot 402; Pier 10 adjacent to the Lyons' lots 553–56; Pier 11 adjacent to

Clow's lot 552; Pier 12 adjacent to the Whites' lots 608–09; Pier 13 adjacent to the Garmans' lots 610–11; Pier 14A adjacent to the Donnellys' lot 612; Piers 14B, 15 and 16 adjacent to the Gill & Assocs. lots 617, 619, 621–24.[9]

After acquiring fee simple title to the community land, the PCIA began conducting "community walks" that were advertised throughout The Pines by way of the PCIA's newsletter. The walks were held at various times beginning in the mid–1960's and continue through the present day. The walks include walking on community lands and have at one time or another included walking on each of the piers extending from the Community Land and Community Lot.

PCIA adopted a pier management plan in September 2003 that was approved by forty-five PCIA members after approximately sixty-one members voted. The management plan included a system for distribution of slips on piers located in The Pines. In order to maintain a slip under the new management system, a lot owner is required to join the PCIA and remain in good standing. After posting a refundable bond and paying a yearly maintenance fee, the lot owner is eligible to apply for a slip. The PCIA assesses a fifteen dollar per day wet storage fee for boats in slips without assignment thereto.

At the time of trial and immediately preceding, none of the appellants were members of the PCIA or had assignments for their boats that they docked at piers. Appellants did not join PCIA, apply for slips or remove their boats from the piers. Appellees assessed wet storage fees against several appellants and filed a counter-claim for the respective sums in answer to appellants' initial complaint.

The trial court found in favor of the PCIA as to wet storage fees and assessed appellants in the following manner: the Donahues $1,080; Johnston $3,150; the Lyons $7,740; Clow $1,150; the Whites $1,725; the Garmans $14,430; the Donnel-

---

9. "Exhibit 290" is the map used at trial and does not show Pier 14A, but does show Pier "14." The trial court referred to "Pier 14A/Donnelly" and so shall we. Pier 14B is shown with dotted lines and is labeled "old pier."

lys $1,575; and Gill & Assocs.—$19,170. A portion of the house which sits upon the Rice's lot is located over community land. The trial court was presented with several versions of precisely where the house encroaches.

At trial, the court asked for draft memorandum opinions from all parties. Appellees' attorney submitted a draft memorandum and opinion at the close of testimony on December 22, 2005 and amended it on December 27, 2005. The trial judge adopted appellees' draft as the opinion and order of the court in the trial proceedings, including that "[appellants] shall pay costs."

Whether and to what extent PCIA is to manage and maintain piers has been contentious. There have been several other suits as between PCIA and/or members of The Pines, beginning with a suit instituted by a previous PCIA president and then-owner of lot 610. In *Kipp v. Lenzer,* in the Circuit Court for Anne Arundel County, in Equity, No. 8401, decided October 22, 1943, the trial court ruled that the defendant and then-owner of lots 551, 607, 608, 609, 611 and 612 remove a fence that was blocking access to Edge Way. Recognizing that The Pines "was laid out as a development, and lots were sold, under a uniform plan and scheme for development of the property as a strictly private residential water front settlement," the court dismissed plaintiff's bill to enjoin defendants from interfering with plaintiff's use of "the lot designated 'Community Beach'. . . ." The trial court dismissed the bill without prejudice so that at any future date, should interference or attempts to interfere arise, suit could be filed.

Wirt Gill, predecessor to Gill & Assocs., filed suit in 1979 after the PCIA dismantled Pier 14B. The suit was dismissed without prejudice and the trial court noted that Gill was claiming adverse possession. The PCIA brought suit against Allen L. and Virginia E. Garman (hereinafter the Garmans), then-owners of lots 610 and 611 and, on August 5, 1982, the Circuit Court for Anne Arundel County, M Case "NO. D–2186 LAW," ruled that exclusive rights to the pier and exclusive riparian rights were not granted to the Garmans by deed.

The court found the PCIA the owners of the riparian land and, as such, the owner of the pier. The court noted that, as co-tenants, the Garmans "should receive contribution from the other members of the community," for the improvements.

In an opinion filed on October 20, 1987 in "CASE NO. 1107894," the Circuit Court for Anne Arundel County found that the PCIA had record title to community property to the waterline. The trial court also concluded that the original use of the property by "Jamie Gill Sutton, *et al"* [sic], the defendants and then-owners of lots 621 and 623, was permissive. The court read the deeds as permitting "use in common of the community property and the use in common of water and riparian rights," making the lot owners essentially co-tenants. The court went on to describe adverse possession of property held as a cotenancy and found that none of the actions of the lot owners amounted to disseisin of property rights. Similar to its 1982 findings, the court recognized that improvements into water in front of land belong to the owner of the land. The burden of proof to show that the severable property interest was adversely possessed was not met in that case. The ability to build the pier arose from a permissive use of riparian rights. Thus, absent ouster, the court found that the PCIA retained ownership of the pier and that defendants and other members of the PCIA could use the pier.

None of the cases cited *supra* were appealed to this Court or to the Court of Appeals. Additional facts will be provided as necessary.

## STANDARD OF REVIEW

We review the findings of a case tried without a jury "on both the law and the evidence." Md. Rule 8–131(c). We will not overturn the judgment of the trial court on the evidence absent clearly erroneous fact finding and will give due regard to the trial court's opportunity to "judge the credibility of the witnesses." *Id.* In other words, under a clearly erroneous standard, this Court does not sit as a second trial court. *L.W. Wolfe Enters., Inc. v. Md. Nat'l Golf L. P.,*

165 Md.App. 339, 343, 885 A.2d 826 (2005) (citing *Lemley v. Lemley,* 109 Md.App. 620, 628, 675 A.2d 596 (1996)). We limit our task to a determination of whether substantial evidence exists in the record to support the lower court's findings. *L.W. Wolfe Enters., Inc.,* 165 Md.App. at 344, 885 A.2d 826. We do not substitute our judgment for that of the trier of fact even if we would have come to a different conclusion. *Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072 (1998). Thus, we "must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." *Id.* (citations omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Snowden v. Mayor of Balt.,* 224 Md. 443, 448, 168 A.2d 390 (1961) (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126. (1938)). The test is reasonableness, not rightness. *Snowden,* 224 Md. at 448, 168 A.2d 390 (citation omitted).

 The deference shown to the trial court's findings as to evidentiary rulings does not apply to its conclusions of law. *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879 (2004). "[W]here the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Id.* (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609 (2002)).

## LEGAL ANALYSIS

### I. SCHEME OF DEVELOPMENT

 The intention to adopt a general plan of development with restrictions may be indicated in different ways. When it is intended to adopt such a general plan, the simplest method is to include all of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed

upon the property for the benefit of the owners of all parts of it. The mere filing of a plat without restrictions on it does not indicate the adoption of any uniform restricted plan of development.

*Scholtes v. McColgan,* 184 Md. 480, 489, 41 A.2d 479 (1945).

■ Where a general plan or scheme is proved

for the improvement of the property, and its consequent benefit, and the covenant has been entered into as part of a general plan to be exacted from all purchasers, and to be for the benefit of each purchaser, and the party has bought with reference to such general plan or scheme, and the covenant has entered into the consideration of his purchase

the inference is permitted that the restrictions were for the common advantage and benefit of all who purchased and not the personal benefit of the grantor. *Turner v. Brocato,* 206 Md. 336, 349, 111 A.2d 855 (1955) (quotations omitted).

The Turners filed two plats in the land records of Anne Arundel County and included language in the original deed granting use in common of the ring of Community Land stipulated to at trial. Predecessors in the claim of title bought lots under the conditions set forth in the recorded plats and deeds.

■ All parties and the lower courts have referred to the use in common grant as a covenant. Black's Law Dictionary 391 (8th ed. 2004) defines a covenant as "[a] formal agreement or promise usu. in a contract." [10] A covenant is an agreement duly made to do or not do a particular act and is a contractual obligation. Maryland Law Encyclopedia, Cove-

---

**10.** Another, more expansive Black's definition is

[a]n agreement, convention, or promise of two or more parties, by deed in writing, signed and delivered, by which either of the parties pledges himself to the other that something is either done, or shall be done, or shall not be done, or stipulates for the truth of certain facts. At common law, such agreements were required to be under seal. The term is currently used primarily with respect to promises within conveyances or other or other instruments relating to real estate. Black's Law Dictionary 190 (4th ed.1983).

nants § 1 (2000). "A covenant by all authorities is a contract under seal...." *Cooke v. England*, 27 Md. 14 (1867). An implied covenant can be inferred from the words used in a contract that the parties intended to form a covenant. *Woodland Beach Property Owners' Ass'n v. Worley*, 253 Md. 442, 449, 252 A.2d 827 (1969) (holding under the circumstances that no covenant would be implied).

In the case *sub judice*, there is a covenant in the deed from the Pines Company, Inc. to the PCIA that was an express covenant meant to run with the land. That covenant was in addition to the use in common language found in the "BEING" clause of the PCIA's deed and appellants' deeds. The use in common language did not promise to do or refrain from doing anything. It simply granted a use in common of the Community Land and Community Lot. It is an express easement as discussed, *infra*.

Appellants contend that the 1932 Machen Mortgage granted them exclusive right to build and occupy piers because it added to the Severn River Co. deeds the phrase "subject however, to the use of adjacent lot owners therein." Further, the Martinet Plat was prepared close to 1932 and also states that use of the Community Land is "subject to the use of adjacent lot owners therein."

Adjacent is defined as "[l]ying near or close to, but not necessarily touching. Cf. adjoining." Black's Law Dictionary (8th Ed.2004). "The courts draw a distinction between the terms 'adjoining' and 'adjacent to,' and ... [have] said that '[t]here are degrees of nearness, and when you want to express the idea that a thing is immediately adjacent you have to say so.'" *Mayor & City Council of Baltimore v. Williams*, 129 Md. 290, 297, 99 A. 362 (1916).

The trial court found no merit in appellants' contentions because of anomalies they would produce when applied to roads, lanes, streets, ways and alleys also conveyed with the same language. Though appellants dismiss that interpretation because of a belief that roads, lanes, streets, ways and alleys are generally not used to the exclusivity of others, we cannot

determine from the record that substantial evidence precluded the trial court from so finding. We agree that the record is devoid of evidence that the Martinet Plat was recorded or relied upon by any subsequent buyers. Thus, the Machen Mortgage did not alter appellants' rights.

■ Even if the Machen Mortgage and the subsequent plat were designed to alter appellants' rights as to the Community Land, the mortgage was recorded after the original plat. Thus, after the delivery of the mortgage, it is beyond the mortgagor to impair or modify the estate. *Sullens v. Finney*, 123 Md. 653, 91 A. 700 (1914) (restrictions could not be applied to a mortgagor who obtained the mortgage before the plats were filed). Reliance on the Pumphrey Deed as acknowledging the changes conferred by the Machen Mortgage is equally flawed because, even considering the addition of the "if any" language, it also refers the grantee to the original Pine–on–the–Severn "plats."

■ Ordinarily the construction of a deed is a question of law and is, thus, reviewed by us *de novo*. *Gregg Neck Yacht Club, Inc. v. County Com'rs of Kent County*, 137 Md.App. 732, 759, 769 A.2d 982 (2001) (*citing, e.g., Chevy Chase Land Co. v. U.S.*, 355 Md. 110, 123, 733 A.2d 1055 (1999)). In construing the language of a deed, the basic principles of contract interpretation apply and we look first to the language of the deed. *Id.*

■ The Court gives effect to the intention of the parties to the instrument as gleaned from the text of the entire instrument, unless that would violate a principle of law. We do not consider extrinsic evidence where the plain meaning of the language in the instrument is clear and unambiguous. *Drolsum v. Horne*, 114 Md.App. 704, 709, 691 A.2d 742, *cert. denied*, 346 Md. 239, 695 A.2d 1227 (1997). If possible, we determine the meaning of the deed by its four corners. *Gregg Neck Yacht Club, Inc.*, 137 Md.App. at 760, 769 A.2d 982.

▆▆▆▆▆▆ With respect to common schemes in land development, the Court of Appeals has opined

[t]hat one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions where they are not specifically expressed in a deed to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development.

*Steuart Transp. Co. v. Ashe*, 269 Md. 74, 88, 304 A.2d 788 (1973) (citing "Judge Offutt, for the Court, in *McKenrick v. Savings Bank of Balt.*, 174 Md. 118, 197 A. 580 (1938), [who] comprehensively reviewed the prior Maryland cases on this subject, beginning with *Thruston v. Minke*, 32 Md. 487 (1870)"); Turner, 206 Md. at 345–46, 111 A.2d 855.

▆▆▆▆▆ The *Steuart* Court further quoted Judge Offutt that " 'The important point decided in *Lowes v. Carter*, 124 Md. 678, 93 A. 216 [1915], was that recordation of a deed *subjecting land to restrictions* afforded constructive notice thereof to all persons dealing with the property, and that such notice was sufficient to charge such persons with liability in respect to the restrictive covenants.' " *Steuart Transp. Co.*, 269 Md. at 88–89, 304 A.2d 788 (emphasis added).

Whether a uniform scheme was intended to be established is a matter of the parties' intentions. *Id.* at 89, 304 A.2d 788. "This intention may be 'indicated in many ways' and the 'whole question becomes a question of fact to be determined from all the circumstances in the case.'" *Id.* (citation omitted). The grants in the deeds of appellants did not restrict the Community Land or Community Lot; they granted access to the realty and to riparian rights. Thus, they are easements appurtenant and run with the land. *Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522 (1940).

It is well established that whenever it appears from a fair construction of a deed that it was the purpose of the parties to create or reserve an easement in the property conveyed for the benefit of other land owned by the grantor, regardless of the form in which the purpose may have been expressed, such a right is deemed to be appurtenant to the land of the grantor and binding on that conveyed to the grantee; and the right thus created or reserved will pass to all subsequent owners of the land to which it is appurtenant.

*Id.* at 136–37, 12 A.2d 522 (holding that "[e]ven though a tract of land may be described by metes and bounds, easements appurtenant thereto nevertheless pass with the conveyance in favor of the dominant estate"). An easement within the chain of title of the dominant estate is enforceable against the servient estate even though it was not recorded within the chain of title of the servient estate. *Beins v. Oden*, 155 Md.App. 237, 243, 843 A.2d 147 (2004) (stating that, although harsh, a person is bound by whatever express encumbrance could be found in the grantor-grantee index).

The original grantors of The Pines were the Turners. The Severn River Co. was an entity of which Mr. Turner was president. The deed created by the Turners that conveyed The Pines to the company of which Leonidas was the president, and the plats accompanying that conveyance, clearly establish a waterfront community. Both plats show Community Land and Community Lot. The deed to the Severn River Co. clearly grants all the Community Land and Community Lot, together with riparian rights, "piers and appurtenances

and advantages to the same belonging or in anywise appertaining. . . . " Whereas the deeds to individual lot owners provided them use in common of roads and the "Community Lot on said Plat and all water and riparian rights incident thereto."

Thus, the deeds granted the use in common of riparian rights. We hold that those terms are clear and unambiguous. The deeds establishing easements for the lot owners' use of Community Land in The Pines and their riparian rights are in common with others, not separate and exclusive.

The term riparian landowners has been defined "as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream." *See, e.g. Conrad/Dommel, LLC v. West Dev. Co.,* 149 Md.App. 239, 268, 815 A.2d 828 (2003) (citations and quotations omitted); *Kirby v. Hook,* 347 Md. 380, 389, 701 A.2d 397 (1997); *Gregg Neck Yacht Club, Inc.,* 137 Md.App. at 764, 769 A.2d 982; *Gwynn,* 122 Md.App. at 497, 712 A.2d 1072. Those who have riparian rights can build piers, wharves, and like structures that connect to the waterfront land and extend out into the water. *Gwynn,* 122 Md.App. at 497–98, 712 A.2d 1072.

Maryland Code Annotated, Environment Article § 16–201 [11] provides:

A person who is the owner of land bounding on navigable water is entitled to any natural accretion to the person's land, to reclaim fast land lost by erosion or avulsion during the person's ownership of the land to the extent of provable existing boundaries. *The person may make improvements into the water in front of the land to preserve that person's access to the navigable water or protect the shore of that person against erosion. After an improvement has been constructed, the improvement is the property of the owner of the land to which the improvement is attached.* A right

---

**11.** Unless otherwise noted the Court shall refer to Md.Code Ann., Envir. § 9–101 to end (1996 Repl.Vol.2006 Supp.).

covered in this subtitle does not preclude the owner from developing any other use approved by the Board. The right to reclaim lost fast land relates only to fast land lost after January 1, 1972, and the burden of proof that the loss occurred after this date is on the owner of the land.

(b) The rights of any person, as defined in this subtitle, which existed prior to July 1, 1973 in relation to natural accretion of land are deemed to have continued to be in existence subsequent to July 1, 1973 to July 1, 1978.

(Emphasis added.)

In *City of Balt. v. St. Agnes Hosp. of City of Balt.*, 48 Md. 419, 422 (1878), the Court of Appeals held that when the City of Baltimore entered upon the land of St. Agnes Hospital and built a pier without consent or permission, that "such improvements must be declared to belong to the riparian owner, in front of whose lot they are made."

■■■ In *Gwynn*, we addressed for the first time in Maryland whether the grant of an easement for ingress and egress established the right to construct a pier or dock and held that it did not. *Gwynn*, 122 Md.App. at 500, 712 A.2d 1072. In considering a deed granting right-of-way to a body of water,

the court must undertake a two-part analysis to determine whether the grantor intended to allow the grantee the right to construct a pier or dock. First, the court must examine the deed alone to determine whether, on its face, it grants or denies the riparian rights. If the deed itself contains an express grant or denial of that intent, the language of the deed controls. *Buckler v. Davis Sand and Gravel Corp.*, 221 Md. 532, 158 A.2d 319 (1960) (when a deed is clear upon its face, construction of the deed must come from the four corners of the instrument alone). If, however, the deed is ambiguous as to the intent of the grantor, the court must undertake the second part of the analysis and may consider parol or other extrinsic evidence to discover the grantor's intent. *See Watson v. Raley*, 250 Md. 266, 268–69, 242 A.2d 488, 489–90 (1968).

*Id.* at 500, 712 A.2d 1072. Thus, if the deed itself contains an express grant or denial of riparian rights, the deed's language controls. *Gregg Neck Yacht Club, Inc.,* 137 Md.App. at 765, 769 A.2d 982.

The grant of riparian rights to appellants in the deeds are express and interpretation is, thus, controlled by the language of the deed. *See Gwynn citing Buckler, supra.* No extrinsic evidence is required to interpret its meaning. The piers built by appellants' predecessors in interest became the property of the riparian owner. *St. Agnes,* 48 Md. at 422. The grant of riparian rights to the lot owners does not equate to the ownership of riparian land. *Gwynn,* 122 Md.App. at 498, 712 A.2d 1072 (granting of an easement does not necessarily make the grantee of the easement a riparian owner) (citation omitted).

Appellants emphasize that neither they nor their predecessors ever asked the PCIA for support or permission in their building and maintenance of piers. Appellants did not need permission as they were expressly granted an easement that included riparian rights in common with other lot owners in the deeds to their lots.

The deed between the Turners and the Severn River Co. was unambiguous in its grant of the Community Land and Community Lot. Thus, ownership of the piers was vested in the riparian owner at the time of each pier's construction and passed through title. The PCIA became owner of the riparian lands and, thus, the piers in 1966. No appellants own piers through conveyance of deeds or by the scheme originally filed by the Turners.

## II. EASEMENT / ADVERSE POSSESSION / ESTOPPEL

### A. Easement Claims

Appellants claim an easement to use Community

Land and the piers [12] and, as discussed *supra*, we agree. "An easement is 'a nonpossessory interest in the real property of another.'" *Jurgensen v. New Phoenix Atlantic Condominium Council of Unit Owners*, 380 Md. 106, 122–23, 843 A.2d 865 (2004) (citing, *e.g., Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630 (1984)). Easements are created expressly or arise by implication. *Jurgensen*, 380 Md. at 123, 843 A.2d 865. An implied easement can be created by reference to a plat. *Boucher*, 301 Md. at 688–89, 484 A.2d 630.

Prescriptive easements mirror adverse possession, discussed *infra*, and arise by implication when one party makes adverse, exclusive and uninterrupted use of the real property of another for twenty years. *Id. See, e.g., Kirby, supra.* Exclusivity in a claim for prescriptive easement differs from that in adverse possession in that the exclusivity need not be absolute in use. Rather, it need only be a claim of right independent of all other users and not dependent upon a similar use in others. *Zimmerman v. Summers*, 24 Md.App. 100, 107, 330 A.2d 722 (1975). Adverse use means that the party uses the real property *without permission or license. Jurgensen*, 380 Md. at 123, 843 A.2d 865 (emphasis added). As a general rule, permissive use of real property cannot ripen into a prescriptive easement. *Id.* (quoting *Kirby*, 347 Md. at 393, 701 A.2d 397).

The riparian rights of lot owners which include the right to build piers, was an express permissive grant in their respective deeds. We disagree with the rulings of the trial courts below that a cotenancy was established because "[a] tenancy in common is a relationship among owners of property. It is created where several persons concurrently hold an estate in land by several and distinct titles with only a unity of possession." *Beesley v. Hanish*, 70 Md.App. 482, 490, 521 A.2d 1235 (1987). Further, "[t]enants in common are equally

---

12. The Lyons refer to "a recreational easement for adjacent property owners to build piers and boathouses for their exclusive use." We addressed "adjacent" in the discussion of scheme and subsume the Lyons' argument as to "recreational easement" in the instant section.

entitled to the use, benefit and possession of the whole common property, provided they do not interfere with the rights of their co-tenants to do the same." *Id.* at 492, 521 A.2d 1235 (citations omitted).

In the case *sub judice*, there is no co-ownership of the Community Land or Community Lot. The PCIA owns the Community Land and Community Lot it obtained by deeds in 1928 and 1966. The PCIA owns lot 406 and title to the Community Land and Community Lot by virtue of these deeds. Appellants own their respective lots and have an express easement both over the Community Land and to riparian rights. Beginning with the 1982 decision of the Circuit Court for Anne Arundel County, cotenancy has been addressed in the Circuit Court's description of the grant of use in common and riparian rights to lot owners. We disagree that the express easements of appellants' deeds granted an ownership interest in the riparian lands. "[A] mere easement is not a possessory interest." *Windsor Resort, Inc. v. Ocean City*, 71 Md.App. 476, 485, 526 A.2d 102 (1987). Moreover, the permissive grant of riparian rights did not grant an ownership interest in subsequently constructed piers.

The circuit court in *PCIA v. Garman* opined "that while there is no proof regarding the value of Defendants' efforts in repairing the pier, they are entitled to some compensation. Generally, one cotenant is entitled to contribution from other cotenants for repairs and improvements to property held jointly." (Citations omitted). Thus, the court and subsequent parties have addressed ouster of one cotenant and based claims of adverse possession and prescriptive easement on that legal theory. As we hold that there has been no cotenancy established, we do not address ouster, and turn our attention instead to the easements granted to lot owners.

Unexplained exclusive use for the statutory period shifts the burden to the landowner to prove that the use was permissive. *Zimmerman*, 24 Md.App. at 111, 330 A.2d 722. Access to and riparian rights incident to the Community Land and Community Lot were granted permissively in the deeds

and plats filed in the 1920's. Thus, there can be no ripening of a prescriptive easement where permission to access the Community Land and Community Lot was granted along with permission to build piers as part of the sharing of riparian rights with other title owners to the land. *See Zimmerman, supra.* Substantial evidence before the trial court supported such a finding and we do not disturb it.

## B. Adverse Possession Claims

Regardless of ownership of the Community Land and the interpretation of the deeds, the parties contest control and ownership of piers and riparian land in the community development. Several appellants claim either adverse possession of the Community Land and/or the piers that abut the Community Land immediately adjacent to lots purchased within The Pines.

 To prove a claim for adverse possession in Maryland, a claimant must establish that he or she was in possession of the claimed property for the statutory period of twenty years. Md.Code Ann., Cts. & Jud. Proc. § 5–103(a);[13] *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185 (1984), *on remand, Peters v. Staubitz,* 64 Md.App. 639, 498 A.2d 661 (1985). Such "possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted." *Id.* (citations omitted). The claimant bears the burden of proof as to adverse possession. *Porter v. Schaffer,* 126 Md.App. 237, 276, 728 A.2d 755 (1999).

 If the statutory time is not met by one adverse possessor successor, possessions under color of title can tack the statutory time as between adverse possessors. *Kirby,* 347 Md. at 395, 701 A.2d 397; *see also Clayton v. Jensen,* 240 Md. 337, 345, 214 A.2d 154 (1965). Generally, the rule is "that possession cannot be tacked to make out title by prescription where the deed by which the last occupant claims title does

---

**13.** Unless otherwise noted, the Court shall refer to Md.Code Ann., Cts. & Jud. Proc. (2006 Repl.Vol.).

not include the land in dispute." *Sachs & Sons v. Ward,* 182 Md. 385, 394–95, 35 A.2d 161 (1943). An exception to this general rule has been recognized in that "two possessions will be tacked if it appears that the adverse possessor actually turned over possession of that part as well as of that portion of the land expressly included in his deed." *Freed v. Cloverlea Citizens Ass'n, Inc.,* 246 Md. 288, 304, 228 A.2d 421 (1967).

All of the elements for adverse possession must be met for the statutory period and the defeat of any one element will defeat any subsequent claim of adverse possession. *Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209 (1964); *see also Gee v. Ghee,* 194 Md. 328, 332, 70 A.2d 810 (1950) (The original possession was permissive and, thus, was not adverse). The burden shifts to a landowner to show that open, continuous, uninterrupted use for the statutory period that is unexplained was permissive. *Wash. Land Co. v. Potomac Ridge Dev. Corp.,* 137 Md.App. 33, 58, 767 A.2d 891 (2001) (adverse use is use without license or permission).

One who continuously asserts ownership for the statutory period would not be required to surrender the title by adverse possession merely because his possession was by mistake. *Costello,* 300 Md. at 71, 475 A.2d 1185 (discussing the modern view that adverse possession can be by mistake).

The hostility that is essential does not rely on ill will or enmity, "but rather that the claimant's *possession be unaccompanied by any recognition, express or inferable from the circumstances,* of the real owner's right to the land." *Hungerford,* 234 Md. at 340, 199 A.2d 209 (emphasis added). The use of the piers in the instant case is permissive as granted to all lot holders in their express easements, discussed *supra.*

### Pier 1—Rice

Though the Rices do not claim adverse possession of the pier adjacent to their lot, they do claim adverse possession to Community Land and a structure that was built upon it. All

of the diagrams presented at trial show some intrusion onto the Community Land and appellants contend that the trial court did not consider or address issues related to what was termed the "Rice Triangle," only Pier 1. Thus, the trial court's failure to make any findings of fact or conclusion of law regarding Counts III and IV of their complaint requires a remand to determine the ownership of the area bounded by the retaining wall, including the septic system.

The presumption that trial judges know the law and apply it properly is of long standing, and springs from multiple sources. One of these sources is the strong presumption that judges, like other public officers, perform their duties properly. *State v. Chaney*, 375 Md. 168, 181, 825 A.2d 452 (2003).

"We also recognize that trial judges are not obliged to spell out in words every thought and step of logic. . . ." *Beales v. State*, 329 Md. 263, 273, 619 A.2d 105 (1993). "[T]he most fundamental principle of appellate review [ ] is that the action of a trial court is presumed to have been correct and the burden of rebutting that presumption is on the party claiming error first to allege some error and then to persuade us that that error occurred." *Chaney*, 375 Md. at 183–84, 825 A.2d 452 (quotations omitted).

The trial judge heard testimony from Douglas Rice on December 22, 2005 and exhibits were entered into evidence. In addition to that evidence specific to the Rices' claims, the court conducted hearings over the course of four days in April and December. The court made a decision on issues "affecting the outcome of the case" when it found that all riparian lands belong to the PCIA in its December 28, 2005 order. *Cohn v. Freeman*, 169 Md.App. 255, 273, 900 A.2d 283 (2006). As we have previously mentioned, "[w]hile it would be beneficial on appeal to have a more developed understanding of the trial court's reasoning . . . without evidence to the contrary, we must assume that the court carefully considered all the various [arguments] asserted and determined all or at least

enough of them to merit the [decision]." *Thomas v. Annapolis,* 113 Md.App. 440, 450, 688 A.2d 448 (1997).

In the light most favorable to appellees, there is substantial evidence in the record to allow the trial court to determine that the PCIA owns the Community Land and Pier 1. *Gwynn,* 122 Md.App. at 502, 712 A.2d 1072. But the trial court erred in not ruling specifically on the adverse possession claims of the Rices as to the Community Land upon which their structures rest.

The trial court found that

[t]he Stibolts leased the pier and boathouse near their property for many years beginning in 1977. The Stibolts consistently recognized PCIA ownership of Pier 1 and the Community Land between their property and Chase Creek. Mr. Avery as late as 2003, accused the PCIA of neglecting its responsibility to properly maintain the boathouse on the pier, the steps leading to the boathouse. Mr. Avery asked the PCIA to either repair or remove the boathouse.

The easement granted to the Rices' predecessor, as part of the scheme of development, did not include the right to build so as to obstruct the Community Land or Community Lot and, thus, the Rices' act of building on the Community Land differs from the permissive riparian uses granted by deed. *See Gwynn,* 122 Md.App. at 497–98, 712 A.2d 1072 (stating that those with riparian rights can build wharves piers and landings that connect to riparian land and stretch into the water). Because none of the "[f]our survey/location drawings" admitted into evidence agreed to the location of the retaining wall, patio, stairs and driveway and both parties agree that Community Land was encroached upon, ownership of the land on which a structure has been built by the Rices' predecessors must be determined on remand.

### Pier 2—Donahue

Because Pier 2 has existed since the 1930's and has been maintained by the owners of lot 309 as exclusive users of the pier, save for neighbors who have used it with permission, the

Donahues posit that they should be granted adverse possession.

 To establish a claim for adverse possession, the statutory time period cannot be interrupted. *See Hungerford, supra.* The Court of Appeals, holding that the statutory time had not been interrupted, opined that

[a]ll the authorities agree that an entry, to have such effect, must be an actual entry upon some part of the land within the period of limitations, and must evince that it is made with the clear and unequivocal intent to invade and challenge the right of the holder of the adverse possession and to retake possession.

*Rosencrantz v. Shields, Inc.,* 28 Md.App. 379, 388–89, 346 A.2d 237 (1975) (quoting *Wickes v. Wickes,* 98 Md. 307, 328, 56 A. 1017 (1904)).

 Substantial evidence presented by both parties at trial exists in the record to support the trial court's finding that adverse possession could not have ripened. Appellants presented a letter from Chet Harriman, a president of the PCIA acknowledging Pier 2 as "your pier" and appellees presented evidence of a letter from its lawyer from 1983 claiming ownership of piers in The Pines. The trial judge found that the Donahues had applied for boating permits from 1993 to 2003, boats were assigned to Pier 2 and in the years subsequent to 1966 and community walks have entered upon Pier 2. Substantial evidence as to adverse possession exists in the record for the court to decide the issue and we find no error of fact or law as to adverse possession.

### Piers 8 and 9—Simmons and Johnston

Pier 8 and Pier 9 are claimed by appellants through color of title and appellants contend that the PCIA, moreover, has acknowledged their ownership as late as 1998 when, in its newsletter, it stated that "the shoreline from the west end of the community beach to the south end of The Terraces is privately owned. Access to the water and private piers in this area is by invitation only." Further, the property in front of

Pier 9 was backfilled and a 1974 confirmatory deed was filed putting on public record the claim that all the property in front of lot 401 and part of lot 402 belonged to the lot owner. The property was advertised for sale as riparian property. Johnston claims no PCIA member ever tried to come onto the contended property when he was there, no Pines logos were painted on Pier 9 and no one from the PCIA ever tried to evict him.

The Simmons' bought their lot from Frederick Green (hereinafter Green). The deeds conveyed the lots that the Simmons' bought to the water's edge. Green established a bulkhead, backfilled washed out land, maintained Pier 8, erected a fence and, as early as 1975, Simmons erected a "No Trespassing" sign and wrote to the PCIA stating that the land and pier were his property. The Simmons personally insure Pier 8 as part of their homeowner's policy and, like Johnston, the Simmons' property is taxed as waterfront. Payment of taxes is a salient fact in support of, but alone not sufficient to prove, adverse possession. *Bratton v. Hitchens,* 43 Md.App. 348, 358, 405 A.2d 333 (1979).

The court had substantial evidence from which to make its decision. The record is replete with testimony and evidence in support of both parties' contentions. We do not find that the trial court abused its discretion by not considering Simmons' testimony because there is no evidence to that effect and we presume the trial judge carefully considered all of the arguments before making a decision. *Thomas,* 113 Md.App. at 450, 688 A.2d 448. Likewise, appellant cites no law to support the contention that building a bulkhead and backfilling the land amounts to erasing the Community Land and, further, one cannot adversely possess one's own land as the Simmons' assert the land between their lots and Chase Creek became. Alternatively, the record reflects that some Community Land remained after the bulkhead was erected and backfilled. The PCIA conducted community walks on the Community Land in front of the Simmons' lot. The trial

judge's ruling was not clearly erroneous that the re-entry was enough to assert ownership by the PCIA.

The trial court found that the Hallams failed to respond to the 1983 letter from the PCIA that it owned Pier 9 and, in 1985, wrote the PCIA in regard to Pier 9 following a community walk. They acknowledged a dispute as to ownership of Pier 9, but that was less than twenty years ago and hardly hostile possession as they asked to discuss a resolution of various claims to the property and settlement. *See Hungerford, supra.* Thus, as Johnston's predecessor did not claim adverse possession or prescriptive easement, title cannot be tacked which Johnston must do in order to reach the statutory period. The PCIA continued to enter the property and painted a logo on Pier 9 in 1990.

### Pier 10—Lyon

The Lyons and their predecessor, Bankert, signed leases for use of Pier 10 with the PCIA that they contend were only to allay the fears of adverse possession the PCIA had as to the Community Land between lots 553–56 and Chase Creek. The Lyons and their predecessor, Bankert, agreed to acknowledge the PCIA's ownership of Community Land in exchange for cooperation with the Army Corps of Engineers. The leases read in pertinent part that Bankert and then the Lyons were the owners of lots 553, 554, 555, 556 and acknowledged that the PCIA was "the owner of the Community land lying between lots 553 and 554 and the waters of Chase Creek." The leases were signed and recorded in the land records and allowed the lessees "the right to maintain and use the dock and boat-house, hereinafter called the Structures, on community land immediately in front" of the lots. The Lyons' lease offered renewals in five year intervals "with the approval of the Board of Governors of the [PCIA]."

The Lyons read the original deeds to convey a "recreational easement" that the PCIA must not interfere with and which gives the Lyons "an exclusive right to build, use, and maintain piers on the water adjacent to their properties, so long as that use did not interfere with access along the beach by other

members of the community." As explained *supra*, the grants in the original deeds were not exclusive. The leases do grant the right to build and use piers as that was included in the deeds, but those rights were not exclusive and a preexisting easement in the deeds.

### Pier 11—Clow

Predecessor owners, the Elgerts, did not respond to the assertion of ownership contained in the 1983 letter from the PCIA. The trial court found that the PCIA routinely assigns slips on Pier 11. Clow argues that she approached the PCIA about extending Pier 11 because without PCIA's consent, as deeded owner of the land, she thought a permit would not be issued. We find no error of fact or law as it relates to the trial court's ruling in regard to Pier 11. There was no mistake on Clow's part as to ownership of the riparian land and no exercise of actual, open, notorious, exclusive, hostile, under claim of title or ownership for the statutory period. *Costello,* 300 Md. at 67, 475 A.2d 1185.

### Pier 12—White

The Whites' lots 608 and 609 were part of the original 1922 plat and the 1943 litigation between Kipp and Lenzer. Notwithstanding that Lenzer's 1941 letter provided, in notorious and hostile fashion, his claim to pier 12, it was not directed at the title owners of the Community Land and Community Lot to which the pier attached as discussed *supra.* Further, the litigation addressed the fence constructed by Lenzer and not the pier.

The court in *Kipp v. Lenzer* ruled that it was

not asked to require the defendants to remove so much of the pier as extends out over the water. In any event, it is difficult to understand how the Court, on the present state of the record, could do anything about that. The *Plaintiffs do not own the Beach but have only an easement therein in virtue of their ownership of lots in the development.* They have no more right to the use of the water in front of the beach than any other member of the general public has;

and, in the absence of a showing that they have suffered a special damage, that is to say, a damage different from that suffered by the general public, by reason of the maintenance of so much of the pier as extends out over the water, they are certainly not entitled to injunctive relief as to that part of the pier which extends out over the water.

\* \* \*

The Court will, accordingly, confine its discussion to the steps leading down the bluff and the boardwalk leading from the foot of the steps out to the water's edge.

(Emphasis added.)

The *Kipp* Court further found that it could not "see any possible objection to the maintenance of the steps" because the bluff could be used for no other purpose than access from lot 609 to the beach. No other lot holder or Kipp could "be hurt by the maintenance of those steps" and although it was possible, though the court did not find an invasion of technical rights; it was not an invasion of practicable rights such that an equity court would interfere. The topography of the land was the issue as to access to the beach, not the steps. The lot owners were precluded from obstructing passage along the community beach.

Notwithstanding that ruling, appellants contend that Lenzer's successor Price held Pier 12 exclusively and even told the PCIA to "go fly a kite" when the PCIA demanded dock rental fees for use of Pier 12. The police were called to evict trespassers and the Whites believed Pier 12 came with their house.

To support their claim of tacking, the Whites' rely on the deeds in their chain of title as having conveyed Pier 12 to them. A review of the deed reveals that the deed from the Whites' immediate predecessor states a conveyance of lots 608 and 609 "TOGETHER with all improvements thereon and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging or in anywise appertaining." The immediately subsequent paragraph states that the grant is "SUBJECT to the covenants, conditions, easements and

restrictions of record and amendments thereto," making the appurtenance of the pier that the Whites and their predecessors claim subject to the common scheme provided for in the plats and the permissive easements granted in the deeds.

Testimony at trial indicated that the "No Trespassing" signs posted by the Whites and their predecessors were taken down by the PCIA and that the PCIA's signs were replaced with private signs. The Whites argue that no Community Lot or Community Land exists, the PCIA has never moored nor assigned a boat at Pier 12, executed any leases with respect to Pier 12 and the Whites have paid the taxes assessed for the pier.

Contrary testimony indicated an absence of no trespassing signs on Pier 12 and that the advertised community walks that occurred with regularity beginning in the mid–1960's and extending to the present time, constituted a reentry on the land for purposes of indicating that appellants' possession was invalid. *Rosencrantz*, 28 Md.App. at 389, 346 A.2d 237. The variance applied for by the Whites in 2001 indicates that there is indeed a strip of community land that appellants acknowledged.

Substantial and conflicting evidence in the record presented by both parties was found by the trial court to militate in favor of the PCIA and we find no clear error of law or fact in which to ground a reversal.

### Pier 13—Garman

In previous litigation, the court ruled that, "even though the Garmans may have rebuilt the pier as a result of its destruction by ice during the winter of 1976–1977, it shall remain the property of the riparian owner." The court named the PCIA as riparian owner and, thus, appellees claim that that ruling precludes appellants' claim as to ownership under *res judicata*. We disagree. A ruling as to ownership of the pier does not preclude the beginning of a new statutory period if the elements of adverse possession are met. The moment adverse possession is interrupted another period may begin *de*

*novo. Hughes v. Insley,* 155 Md.App. 608, 622, 845 A.2d 1 (2003).

Appellants aver that notwithstanding the ruling of the Circuit Court for Anne Arundel County in favor of the PCIA in 1982, the Garmans nevertheless continued to possess Pier 13 to the exclusion of all others and, thus, meet the statutory requirements for adverse possession. PCIA letters requesting compliance with the court order were ignored and assigned boats' owners were told by Mr. Garman that he was the "dockmaster." Substantial evidence exists in the record that Mr. Garman was not claiming exclusive use of Pier 13 and, in any event, the PCIA exerted control over the pier by assigning boats, sending correspondence and conducting community walks thereby interrupting any twenty year period begun after the 1982 decision and we do not find clear error on the part of the trial court.

### Pier 14A—Donnelly

Appellants contend, in the case of Pier 14A, that the PCIA was aware of appellants' actual, open, notorious, exclusive, hostile, claim of title or ownership for the statutory period when their predecessor, Wunderlich, applied for a permit to repair or replace the pier in 1976 and again in 1998. The record indicates that the Donnellys applied for and received boat slip assignments from the PCIA and that community walks occurred on Pier 14A.

Further, the deed from Wunderlich does not reference the pier and provides that the grant is "SUBJECT however to all easements, covenants and restrictions of record." Those easements of record grant use in common to all lot owners of the Community Land and the piers thereto attached.

There is no mistake of ownership as the PCIA owns all of the piers. The riparian rights granted in the easement appurtenant allows for the building and repair of piers. Thus, we find no clear error on the part of the trial court.

### 14B, 15 and 16—Gill & Assocs.

The trial court was not clearly erroneous in finding that appellants did not acquire title to the above referenced piers by adverse possession because substantial evidence exists in the record for the trial court to have so found from the following evidence in the record.

### 14B

Pier 14B was constructed some time before 1943. The trial court found that Pier 14B can hardly qualify as a pier because it was dismantled in the late 1970's. That action by the PCIA was the impetus for the suit filed by Wirt Gill and later dismissed without prejudice. Testimony exists in the record from Nichols that the pier is in use.

### 15

The finding of the Anne Arundel Circuit Court, which was not appealed, granted ownership of Pier 15 to the PCIA in 1987. A claim of adverse possession would have had to begin again and, thus, we perceive no clear error of the trial court's factual finding that adverse possession did not accrue and Pier 15 belongs to the PCIA.

### 16

Appellants contend that, because the pier was constructed and solely maintained by the a previous owner and the general reputation was that the pier belonged to the owners of lot 624, that they have acquired title to Pier 16 by adverse possession. The PCIA added additional pilings and the record indicates that Nichols was unable to get a permit to repair it because of the PCIA's ownership of the pier.

### C. Equitable Estoppel Claims

Equitable estoppel is defined in Maryland as the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against

another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Jurgensen*, 380 Md. at 125, 843 A.2d 865. The party relying on estoppel has the burden to prove the facts that create it. *Id.*

The Court of Appeals has opined that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. *Where the condition of the title is known to both parties or both have the same means of ascertaining the truth, there can be no estoppel.*

*Id.* at 126, 843 A.2d 865. (holding that the recorded declaration and plats were available to either party for examination)(quotations and citations omitted) (emphasis in original). Appellants and the PCIA alike had access to the land records where the easements at issue were recorded, and thus, access to the truth. *Jurgensen*, 380 Md. at 125, 843 A.2d 865.

Taking possession with knowledge that the contended property did not pass by deed charges one with notice. *Klein v. Dove*, 205 Md. 285, 295, 107 A.2d 82 (1954). A party's lack of an earlier protest or complaint as to a structure did not render applicable "the principle of estoppel for ... mere silence as to rights of record does not create an estoppel." *Id.* at 295–96, 107 A.2d 82 (citing *Sachs & Sons, supra*).

In the case *sub judice*, all parties had access to the pertinent land records under review as to the recorded plats and deeds. No party can claim an absence of means of ascertaining the truth, even in the light of confirmatory deeds. The essential elements of estoppel have not been met by any appellants.

Three essential and related elements are generally necessary to establish equitable estoppel: 1) voluntary conduct or

representation; 2) reliance; and 3) detriment. "Clearly . . . equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment." Ultimately, "whether or not an estoppel exists is a question of fact to be determined in each case."

Generally, wrongful or unconscionable conduct, on which a party relies to his detriment, is an element in the application of equitable estoppel. But, equitable estoppel may apply "even in the absence of any fraud or wrongful intent" to mislead, if "the actions or the inaction of the party estopped . . . 'cause a prejudicial change in the conduct of the other'."

\* \* \*

■ "[T]he rule now to be followed in Maryland is that equitable estoppel may be applied, not only when the conduct of the party to be estopped has been wrongful or unconscientious, and relied upon by the other party to his detriment, but also when the conduct, apart from i[t]s morality, has the effect of rendering it inequitable and unconscionable to allow the rights or claims to be asserted or enforced."

*Gregg Neck Yacht Club, Inc.,* 137 Md.App. at 773, 769 A.2d 982 (internal citations omitted).

■ The record is replete with conflicting evidence as to who owns or controls the piers and riparian rights surrounding The Pines. The PCIA sent letters to each appellant claiming ownership of the piers and asserting rights thereto. Appellants could not rely upon their predecessors or the title land owners of the Community Land and Community Lot when their predecessors built piers and the land owners were silent as to their use and ownership. *Gregg Neck Yacht Club, Inc., supra.* Further, beginning in 1966 when the PCIA gained title to the Community Land and Community Lot, an aggressive campaign to assert ownership began and appellants were thereafter on notice that exclusive rights were challenged.

### III. THE PCIA—FEES

The trial court found that

[the PCIA] is declared to have the right, power and authority to use, control, and regulate the use of the Community Land and all improvements existing thereon, including the right (a) to assign boat slips at piers and boathouses extending from the Community Land (b) to charge fees for costs associated with the piers and boathouses and (c) to charge wet storage fees to boat owners who fail to comply with slip assignment regulations.

Appellants raise the issue that, at trial, the judge noted that attempts by the PCIA to control piers violates the R–2 zoning of the area because community piers and marinas are not permitted uses except in the area adjacent to the Community Beach. And an agreement or contract that violates a law is unenforceable in Maryland, *see, e.g. State Farm Mut. Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631, 643, 516 A.2d 586 (1986), even if no crime has yet occurred. *Son v. Margolius, Mallios, Davis, Rider, & Tomar,* 114 Md.App. 190, 212, 689 A.2d 645 (1997), *rev'd on other grounds,* 349 Md. 441, 709 A.2d 112 (1998). The impact of zoning on the issue of ownership of the piers was not at issue at trial and, thus, we do not review it on appeal. Md. Rule 8–131(a).

Appellees view the PCIA as not merely a homeowner's association, but also the owner of the Community Land, piers and related structures. The PCIA believes that it represents the cotenants who share rights to the piers, boathouses and is an easement holder itself as a lot owner. The PCIA is partly correct in that it is a landholder sharing an easement, but it is not a cotenant as discussed *supra.*

The PCIA's articles of incorporation state that the PCIA was formed "to control and care for Community lots and beaches, the water supply, fire protection, utilities, enforcement of restrictions, roads, police, lighting, legislation, transportation and all other matters in which the community interest as a whole is involved." It amended those articles in 1975 to " 'control and maintain' community property and amenities

'for the exclusive recreational use of community members and their guests' " and its current purpose as stated in its Constitution is that it shall "control and maintain all community land and association owned properties in [The Pines] and supervise their proper use."

The PCIA does not qualify as a homeowner's association under authority of the Maryland Homeowner's Association Act (The Act).[14] A duly qualified homeowner's association under The Act requires that a declaration be recorded and absent such filing, the PCIA may not enforce the collection of mandatory fees as a homeowner's association. Md.Code Ann., § 11B–101(d).

Appellees claim the role of the PCIA has shifted over the years. First, it was a group of lot owners who shared a "perceived common interest." In 1928, when the PCIA obtained lot 406, it became a land owner who shared common easement rights with other lot owners, was bound by the express covenant in its deed as to lot 406 and, finally, the PCIA became the fee simple owner of the community lands. The PCIA holds title to the Community Land and Community Lot that are servient estates to the use in common easement held by all lot owners of The Pines.

The trial court found that the PCIA's powers emanate from several principles of property law and the laws regarding homeowners, as well as implied contract theories. *See Cade v. Montgomery County,* 83 Md.App. 419, 575 A.2d 744 (1990), *cert. denied,* 320 Md. 350, 578 A.2d 190 (1990). The court erred in so ruling. In *Cade,* we held that a vehicle owner who parks where signs prohibit unauthorized parking impliedly agrees to pay fines. *Id.* at 428, 575 A.2d 744. We relied on the provisions of Bill No. 16–87 that regulated the posting of signs and further opined that the obligation to pay may also arise by statute or ordinance. *Id.* and n. 6, 575 A.2d 744.

---

**14.** Unless otherwise indicated, the Court shall refer to Maryland Code Annotated, Real Property Article § 11B–101 *et. seq.* as "The Act."

Ruling in the PCIA's favor, the court found "that the PCIA's ownership and a duty to manage the Community Land for the benefit of all Pines residents would be an empty portfolio without the ability to enforce reasonable rules designed to offer a limited resource as fairly as possible to Pines residents." The court declined to second guess the corporate decisions of the PCIA. *Black v. Fox Hills N. Cmty. Assoc.*, 90 Md.App. 75, 599 A.2d 1228 (1992).

Thus, the trial court attempts to formulate a covenant because it found a substantial change in the character of The Pines due to "the tremendous increase in the population of the Pines and the attractiveness of using community facilities...." The court opined that

> without the [c]ourt's endorsement of the wet storage fees, the radical change in the Pines neighborhood, and the chaos that may well ensue if the PCIA does not have some method by which to maintain the piers properly and distribute their use fairly among Pines residents, "perpetuation of the ['use in common'] restriction [will be] of no substantial benefit ... and [will] defeat the object or purpose of the restriction." *Id.*, at 198, 599 A.2d 1228[sic].

There exists no covenant in the deeds of lot owners or their respective predecessors in title that could be affected by a changed character. The only covenant in any deed is that of the PCIA's deed from the conveyance of lot 406. In any event, the original Plats established 250 dominant lots with expressly granted easements over the servient Community Land and Community Lot. Thus, no change in circumstance warrants a new covenant because the mooring space on the piers for even one boat for every lot in The Pines' original scheme would be limited.

Any change in circumstance would presumably come from the 1966 deed that reserved the right to grant to the residents of Hidden Hills some easement rights that were granted to all lot holders in The Pines. The deed from White Acre to the PCIA referenced Hidden Hills by

RESERVING THE RIGHT TO GRANT SUCH USE IN COMMON WITH OTHERS to the owners of land or lots in the development known as "Hidden Hills" as shown on a Plat dated April, 1964, recorded among the Land Records of Anne Arundel County in Plat Book # 33, folio # 1, and other lands located in Pines–on–the–Severn by Chas. H. Steffey Incorporated and Reliable Homes Corporation, to the same extent and use as the residents of Pines–on–the–Severn enjoy.

 As indicated at oral argument, no party has contested that grant since it was given, nor is it before the court presently.[15] In any event, it appears that the grant of an easement for the residents of Hidden Hills may be contrary to the easement granted expressly in the deeds to the then-current lot owners in the original scheme of development. A servient tenement cannot obstruct the reasonable use and enjoyment of the dominant tenement's easement. *Drolsum v. Luzuriaga,* 93 Md.App. 1, 17–18, 611 A.2d 116 (1992) (citing *Maddran v. Mullendore,* 206 Md. 291, 297, 111 A.2d 608 (1955) ("the owner of a servient tenement cannot close or obstruct the easement against those who are entitled to its use in such manner as to prevent or interfere with their reasonable enjoyment.")).

The PCIA regulations at issue require payment of the "annual community improvement fee" only if a lot owner desires more than use of unimproved community waterfront property because that unimproved community land presumably requires minimal or no maintenance costs.

 When an easement is created by conveyance, the scope of the easement is determined by the conveyance. *Drolsum,* 93 Md.App. at 19, 611 A.2d 116. In the event the

---

**15.** At oral argument counsel for appellants posited that Hidden Hills was allowed use in common with lot holders of The Pines through a deal struck between a developer and the PCIA: "So, [the PCIA] made a deal with [the developer] and the deal essentially was that he would pay them $12,000 and give them title so long as they agreed to use the, that Hidden Hills could use the community property in Pines for their use."

conveyance is silent or indefinite as to the duty to repair, the inference to be drawn is that such duty as exists is upon the owner of the easement. *Id.* (citing *Restatement, Law of Property* § 485 *Maintenance,* Comment b).

In *Drolsum,* we recognized that a road used in common by the land owner across which land the road runs and by the person to whom the easement is granted, should be equally burdened by any reasonable repairs as nearly as possible to their respective use of the road. *Id.* at 20, 611 A.2d 116.

The Drolsums, as owners of the servient estate, did not want to bear any of the expense as to maintenance of the easement. We held that the costs of maintaining an easement "should be distributed among all users in proportions that closely approximate their usage." *Id.* at 22, 611 A.2d 116. Thus, the user of an easement is responsible for maintenance in accordance with proportionate use. Whomever makes use of the easement, in this case the piers, is responsible for proportionate maintenance.

Appellees created a working group headed by appellant Keith Lyon that concluded pier maintenance was beyond the PCIA's budget. Some piers required routine maintenance and some had significant needs and the work group presented a management plan in September 2003, the absence of which, in appellees' view, caused the confusion as to who should maintain the piers.

Appellees argue that appellants need not pay the maintenance fees or become members of the PCIA to use the piers and can use the piers if they want to pay wet storage fees. The plan submitted by the group, as discussed *supra,* was ignored by appellants who, by the terms of the By–Laws, were assessed the wet storage fees adjudged at trial. The fees, as discussed *infra,* cannot be considered reasonable maintenance fees in proportion of use of the easement and, thus, may not be assessed by the holder of the servient tenement.

The trial court found that the PCIA has "the right, power and authority to use, control, and regulate the use of the Community Land and all improvements existing thereon, in-

cluding the right (a) to assign boat slips at piers and boathouses extending from the Community Land...." We agree that the PCIA has the right to use the Community Land and piers and so do appellants. The trial court is mistaken to direct the scope of the easement beyond that which is in the conveyance. *Drolsum*, 93 Md.App. at 19, 611 A.2d 116. A servient tenement cannot close or obstruct an easement so as to prevent the reasonable enjoyment of those entitled to use it. *Maddran v. Mullendore*, 206 Md. 291, 297, 111 A.2d 608 (1955). Similarly, the PCIA may not control the piers to exclude those who have an express grant of riparian rights nor can appellants prevent the PCIA's use in common in its role as lot owner and servient tenement.

Appellants argue that if not created by an express provision, the PCIA's only basis for collecting fees then, can be that there is "an implied obligation to *contribute to the maintenance* of commonly held property without regard to usage." Restatement (Third) of Property, Servitudes, § 6.2 (2000) (emphasis added by appellant). We agree. The fact that those sharing a common easement may be responsible for its maintenance does not make the several landowners a common-interest community because their duty is determined by the extent of their use. *Id.*

Appellants see the common easement described in the Restatement as a precise match to the case at bar and posit that, had the PCIA ever expended any money on building or repairing the piers, it could ask for equitable contribution. It may not, however, seek punitive fees, particularly in light of deeds providing that the community land is subject to use by lot owners of The Pines. Moreover, there is no express or implied fee provision in the chain of title nor any history of fee assessments in The Pines. Where, as in the instant case, there is no clearly defined provision for the maintenance of the easement, an inference may be drawn from the deed's silence that the duty to maintain is upon the appellants as owners of the easement. *Drolsum*, 93 Md.App. at 19–20, 611 A.2d 116. Appellees, as lot owners, also must contribute in proportion to

their respective use. We hold that reasonable maintenance fees of the shared easement in proportion to an easement owner's use can be assessed. *Drolsum,* 93 Md.App. at 20, 611 A.2d 116.

The PCIA's right to require reasonable maintenance fees comes from a shared right of use in the easement and not from its status as a community association or by a covenant in lot owners' deeds. Lot owners who make use of piers and, thus, the easements for riparian rights granted in deeds share proportionately reasonable maintenance fees. *See Drolsum, supra.*

■ Appellants' final argument is that the PCIA did not acquire the community property until forty years after the The Pines was established and there is no declaration requiring lot owners to support the common land that the PCIA owns. The trigger for membership dues is the voluntary joining of the PCIA and, even then, argues appellant, "one does not agree to the power of the PCIA to levy assessments or fines." *See Woodland Beach Prop. Owners' Ass'n,* 253 Md. at 449, 252 A.2d 827 (holding no charges upon individual lots could be assessed by a voluntary association absent an express covenant). The PCIA conceptualizes itself in the legal position of a private club and appellant asks us to reject outright the claim that lot owners should pay user fees to exercise a right they already have and for which the PCIA has produced no proof of maintenance expenditures. The cases relied upon by appellees nearly exclusively involve associations with legitimate powers under The Act. Thus, appellees' reliance on the forty-five member vote is superfluous because no legal authority exists for them to levy fines. In *Woodland Beach,* no obligation was placed on the lot owners to contribute to the maintenance of the community property. Similarly, the title instruments in the instant case do not provide for any charge to be assessed to lot owners. *Woodland Beach,* 253 Md. at 449, 252 A.2d 827. Restrictions on the use of land are in derogation to the natural right that the land owner has the right and enjoyment of property. *Id.* at 450, 252 A.2d 827

(quoting *Norris v. Williams,* 189 Md. 73, 76, 54 A.2d 331 (1947)). Restrictive covenants are construed strictly and "should be resolved in favor of unrestricted use of property." *Id.* (citations and internal quotations omitted).

As discussed, *supra,* the PCIA's right to collect reasonable fees flows from its use in common of the riparian rights and its ownership of the servient estate. The wet storage fees were found by the court to be "fees to boat owners that fail to comply with slip assignment regulations." These fees are punitive fines under the plan that controls usage of the piers instituted by the PCIA as a community association and incorporation and not reasonable maintenance fees in proportion to the usage of the shared riparian easement. The punitive nature of the fees are best reflected in the following exchange between Thomas Novak and appellant's counsel in regard to Pier 14B.

[Appellants' counsel]: So you're indicating that the pier is useable for storing boats. Is that what you're saying?

[Novak]: Well, no. Our first impression was to remove the boat immediately. The incentive of the wet storage fee was to perhaps get Mr. Nichols to remove the boat. It wasn't his boat. He was doing it as a favor to perhaps a former neighbor or friend.

[Appellants' counsel]: So you can charge wet storage fees even though you say it's not useable for wet storage?

[Novak]: It's a—it was the incentive. We didn't want the wet storage fee. We really wanted him to move the boat. We thought it was an unsafe condition.

The record reflects that the fees were researched and comparable to other marinas in the area of The Pines and counsel at oral argument proffered that fees were appropriate because appellants exceeded the scope of their easements. But, we determine from the court's language and the record that the PCIA's assessment of the fees was punitive and unreasonable for the maintenance of the easement. We reverse as the trial court made no finding of reasonable maintenance fees based on the shared use of the easement.

## EPILOGUE

The deeds in the instant appeal created a property right for all lot owners. The express easements are for riparian rights and riparian rights include the right to wharf out. The PCIA has not constructed any piers and is the owner of the piers by virtue of its riparian land ownership. In more typical waterfront communities, easements created for lot owners are likely easements of use of piers and access to water. That is not the case in the matter under review because a grant of riparian rights without reservation includes the right to build piers as appellants did.

The parties, thus, are equally vested with the legal right to build and enjoy piers in common with all other lot owners. The PCIA is both a lot owner in this context and the servient tenement. The inability of the parties to come to agreement on how to implement the shared rights of use and maintenance creates interference in the use and enjoyment of the easements for all parties. In the attempt to devise an equitable solution, the trial judge granted executive powers to the servient tenement.

The fees that the PCIA established are not appropriate maintenance fees under easement law, as delineated in *Drolsum.* Fees based upon commercial usage and enforced for punitive purposes do not embody the legal principles of the easement law.

The PCIA may not charge fees for usage of an easement granted expressly to lot owners and neither may lot owners exclude the PCIA or other lot owners from usage of piers. The issues before the Court allowed for determination of easement law application to a set of facts that do not lend themselves to the type of practical solution as decreed by the trial court. According legal effect, as we have accorded in this appeal, to the deeds and the express easements granted therein for riparian rights result in the only legally sound disposition. Were the PCIA both the owners of the riparian land and exclusive owners of the riparian rights incident thereto, an equitable solution similar to that proposed by the

trial court could allow for fees to maintain the easements of usage and access.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–SIXTH EACH BY PARTIES OF THE BRIEFS REFERENCED IN THE OPINION AS FOLLOWS: APPELLEES, DONAHUES, LYONS, JOHNSTON, RICE AND WHITE.